UNITED STATES of America, Appellee,

v.

Louis MALPESO, aka Bobo; Robert
Gallagher; Joseph Amato,
Defendants–Appellants.

Nos. 922, 979 and 980, Dockets 96–
1237, 96–1262 and 96–1263.

United States Court of Appeals,
Second Circuit.

Argued March 24, 1997.

Decided June 3, 1997.

Judd Burstein, Burstein & Fass LLP, New York City (Marc Fernich, Burstein & Fass LLP, New York City, of counsel), for Defendant–Appellant Louis Malpeso.

John L. Pollok, Hoffman & Pollok, New York City (Gerald L. Shargel, Jeffrey Lichtman, Michael S. Pollok, Hoffman & Pollok, New York City, of counsel), for Defendant–Appellant Robert Gallagher.

Alan S. Futerfas, New York City, for Defendant–Appellant Joseph Amato.

Valerie Caproni and Sung–Hee Suh, Assistant United States Attorneys, Brooklyn, N.Y. (Zachary W. Carter, United States Attorney, Eastern District of New York, David C.

James, Assistant United States Attorney, Brooklyn, N.Y., of counsel), for Appellee.

Before NEWMAN, Chief Judge, MINER and GODBOLD,* Circuit Judges.

MINER, Circuit Judge:

Defendants appeal from judgments entered in the United States District Court for the Eastern District of New York (Dearie, J.), following a jury trial, convicting them of numerous offenses arising from their participation in a war between competing factions of the Colombo organized crime family. Defendant-appellant Louis Malpeso was convicted on four counts of acts of violence or conspiracies to commit acts of violence, for the purpose of maintaining and increasing position in a criminal enterprise, in violation of 18 U.S.C. § 1959, two counts of using or carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1), and one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). Malpeso was sentenced to a 95–year term of imprisonment, a 3–year term of supervised release, restitution in the amount of $24,962.35, and a $350 special assessment. Defendant-appellant Robert Gallagher was convicted on four counts of violating 18 U.S.C. § 1959 and two counts of violating 18 U.S.C. § 924(c)(1), and was sentenced to a 39–year term of imprisonment, a 3–year term of supervised release, restitution in the amount of $13,740.00, and a $300 special assessment. Defendant-appellant Joseph Amato was convicted on one count of being an accessory after the fact to murder, in violation of 18 U.S.C. § 3, and, under a separate indictment and after a separate trial, one count of violating § 924(c)(1), and was sentenced to a 211–month term of imprisonment, a 3–year term of supervised release, restitution in the amount of $11,222.35, a fine of $50,000 and a $100 special assessment.

## BACKGROUND

The charges in this case arose from an internal power struggle (the "Colombo war") between two rival factions of the Colombo Organized Crime Family of La Costa Nostra (the "Colombo Family" or the "family"): those loyal to Carmine Persico, the imprisoned family boss, and those loyal to Victor J. Orena, the acting boss of the family. We have chronicled on many occasions the events of the Colombo war, most recently in *United States v. Orena*, 32 F.3d 704 (2d Cir.1994), *United States v. Brady*, 26 F.3d 282 (2d Cir.1994), *United States v. Scopo*, 19 F.3d 777 (2d Cir.1994), *United States v. Amato*, 15 F.3d 230 (2d Cir.1994), and *United States v. Orena*, 986 F.2d 628 (2d Cir.1993). Thus, we will discuss only those events relevant to the prosecution giving rise to this appeal, all of which occurred between mid-1991 and 1994, when conflicts between the rival factions became violent.

Malpeso, Gallagher and Amato, all members of the Orena faction, were charged with crimes relating principally to two planned "hits" on Persico faction members that went awry. The first involved the killing of Matteo Speranza, a 17–year–old boy who worked in a bagel store believed to be owned by two Persico faction members (the "Speranza Murder"). The second involved the shooting of Daniel Norden, a 16–year–old boy and innocent bystander, who sustained nearly fatal injuries (the "Avenue P shooting"). Additional evidence was presented at trial concerning other incidents in which one or more of the defendants were involved in plots or attempts to murder members of the Persico faction.

The charges were proved primarily through the testimony of an accomplice witness, Christopher Liberatore ("C.Liberatore"), who participated in several violent incidents with the defendants. C. Liberatore's testimony regarding the defendants' participation in the Colombo war was corroborated by tape-recorded conversations, law enforcement surveillance, evidence seized during searches, and the testimony of his father, Anthony Liberatore ("A.Liberatore"), another accomplice witness.

---

* The Honorable John C. Godbold of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

*I. The Speranza Murder*

Orena faction members met frequently at "Cafe on N", a social club owned by Joseph Scopo and operated by Gallagher, Craig Marino and John Baudanza (all Orena loyalists). In 1991, John Rosatti, also an Orena loyalist, came to Cafe on N to speak to Orena. Rosatti wanted Gregory Scarpa, Sr., a Persico faction member, killed because he had apparently abused one of Rosatti's employees. Subsequently, members of the Orena faction tried unsuccessfully to kill Scarpa, setting off an extended course of violence between the factions.

By late 1991, Orena loyalists had a standing order to kill anyone who was loyal to Persico. C. Liberatore was an "associate" in the Orena faction, as opposed to a full "member",[1] and was assigned to follow Malpeso's orders. Malpeso was one of several members of the Orena faction who followed Pasquale Amato ("Patty Amato"), a captain in the Colombo Family. Over the next few months, there were various shootings and murders involving the two factions, the facts of which were related by C. Liberatore at trial.

On December 6, 1991, C. Liberatore and Malpeso were at Cafe on N celebrating their birthdays when those present at the cafe learned that Vincent Fusaro, an Orena faction associate, had been killed by Scarpa and his crew. In response, a plan was devised by Malpeso and Amato to murder Persico loyalists Frank Guerra a/k/a "BF" and Anthony Ferrara the following night. In the early morning of December 8, 1991, Malpeso, Amato, the Liberatores and Tommy Cappa set out in three cars to find and kill Guerra and Ferrara. Malpeso drove a "safe car," a car in which no firearms were carried. A. Liberatore was driving a second car, with C. Liberatore as the shooter. Amato and Cappa were in Amato's car. Everyone but Malpeso was armed.

The hit team drove to Ferrara's house and then to Guerra's house, but found no activity at either, so they proceeded to Wanna Bagel,

a shop believed to be owned by Ferrara and Guerra. At the bagel shop, the lights were on and a person was inside, but the hit team determined that it was neither Ferrara nor Guerra. The team drove back to Ferrara's house, and then to Guerra's house, where they decided to park and wait for Guerra's return. At this point, the team noticed a black Lincoln repeatedly passing by them. Sensing that the automobile might contain enemies, they decided to move on, with the Lincoln trailing them. A few minutes later, C. Liberatore entered Malpeso's car to provide protection in case there was a gun fight with the Lincoln's occupants.

The Lincoln soon stopped following the group. However, when it turned away, the hit team followed, eventually ending up in a driveway. There, Malpeso ordered C. Liberatore to shoot the Lincoln's passengers, but C. Liberatore, with the support of Amato, declined. At this point, the team disbanded.

C. Liberatore and Malpeso went back to Malpeso's apartment. Shortly thereafter, Malpeso was informed by phone that his sons had been shot. According to C. Liberatore's testimony, Malpeso indicated that he thought the people in the black Lincoln were responsible, and ordered C. Liberatore to go "get the guys in the black [Lincoln]," "go find Anthony [Ferrara] and [Guerra]," and "go kill the guys in the bagel store." (Tr. at 353). C. Liberatore called A. Liberatore, who picked him up at Malpeso's and agreed to help carry out Malpeso's orders.

The two Liberatores drove to Ferrara's, then Guerra's, then the last location of the Lincoln, then to the bagel store. They repeated that circuit twice, finally stopping at the bagel store. C. Liberatore waited until a customer left, then entered the store and looked to see if anyone was in the back. Seeing no one, he asked Speranza, the clerk behind the counter, where Ferrara and Guerra were. Speranza asked why C. Liberatore was looking for them, and reached under the counter. Seeing Speranza reach under the counter, C. Liberatore pulled out his gun and

**1.** As we have observed in related cases, an associate in the Colombo Family is an individual who has not become a "made" member of the family, that is, formally inducted into the family, but who participates in the family's activities, typically with aspirations of becoming a made member. *See Brady,* 26 F.3d at 290; *Amato,* 15 F.3d at 232.

shot Speranza several times, then fled the store. The Liberatores drove home, where C. Liberatore showered while A. Liberatore abandoned the car in the Georgetown section of Brooklyn. The gun used in the shooting was broken and disposed of, and A. Liberatore's wife was told to report his car stolen.

The Liberatores went to an off-track gambling location run by Malpeso, where they told Malpeso, Amato and others present what had happened. Patty Amato arrived and, after a private conversation with Malpeso and Amato, ordered Amato to hide C. Liberatore from the police. Amato then directed Chris Barrett, an associate of his, to take C. Liberatore to Barrett's apartment and keep him there until further notice. Barrett did so. According to A. Liberatore's testimony, he, Amato and other confederates then went back to A. Liberatore's car and drove it to an industrial area in Canarsie, where they wiped it down for fingerprints and pulled the ignition out to make it appear as though it had been stolen and abandoned.

## II. The Avenue P Shooting

Following the Speranza murder, C. Liberatore continued to be assigned to Malpeso, who continued to be part of Patty Amato's crew. According to C. Liberatore's testimony, Patty Amato's crew regularly went out as a hit team to kill members of the Persico faction. When out in this fashion, they would frequently encounter other Orena faction hit teams. One such team was run by Scopo and Salvatore Miciotta, and included Gallagher.

C. Liberatore testified in detail about six separate incidents in which he and Gallagher jointly participated in attempts to murder members of the Persico faction. One of these incidents was the Avenue P shooting, in which a young man was shot and seriously injured. The Avenue P shooting occurred on June 4, 1992. C. Liberatore met Scopo, Miciotta, Malpeso and Gallagher at Cafe on N. The group accompanied Scopo to a meeting in Coney Island, then proceeded to drive around looking for Persico loyalists. Malpeso handed C. Liberatore a .38 caliber pistol and stated that if anything happened, he and Gallagher were to be the shooters. They

passed a dark blue Lincoln with two males inside. Gallagher identified one of them as Thomas McLaughlin, a Persico loyalist, and began shooting at the car through the window. The men in the Lincoln exited the car and ran. Gallagher and C. Liberatore exited their car and continued firing. C. Liberatore testified that he fired at three people who were in the nearby park running toward him, and Gallagher fired down the block at one of the people from the Lincoln. Daniel Norden, an innocent bystander sitting on a bench in the park, was shot in the head and suffered near-fatal injuries. Eyewitnesses substantially corroborated C. Liberatore's account of the incident.

Scopo called them back to the car and they drove off. Several blocks away, the group split up. Gallagher proposed disposing of the guns they had used. C. Liberatore wiped down his gun and threw it into a storm sewer.

## III. Indictments

A series of indictments were handed down on December 8, 1993, each charging various members of the Orena faction with, *inter alia*, conspiracy to murder members of the Persico faction as part of the Colombo war. The indictment leading to convictions in this case (the "Malpeso case") originally charged Malpeso, A. Liberatore and C. Liberatore with conspiracy to murder members of the Persico faction, and with the murder of Speranza. C. Liberatore was also charged with participating in the Avenue P shooting. Another of the December 8 indictments charged Amato and various of his followers with conspiracy to murder members of the Persico faction, loansharking and gambling, and also with using or carrying a firearm in connection with the conspiracy to murder (the "Amato case").

A superseding indictment, returned in the Malpeso case on September 28, 1994, added Amato and Gallagher as defendants. Amato moved for a severance from the Malpeso case and to consolidate the charges against him in the Malpeso case with those in the Amato case. The government opposed the motion, and, on December 9, 1994, the district court denied the motion. Amato renewed this mo-

tion in March of 1995, arguing that his due process rights would be violated if the government tried him in two cases. The government again opposed the motion, arguing that the charges were made in a fair and efficient manner. The district court determined that the charges against Amato arose from separate occurrences, and thus found nothing unfair about the separate trials.

Around April 7, 1995, C. Liberatore indicated that he was interested in cooperating with the government. He ultimately pled guilty and became a cooperating witness. Around the same time, A. Liberatore also pled guilty pursuant to a cooperation agreement.

A final superseding indictment, returned in the Malpeso case on May 24, 1995, added Malpeso as a defendant in the counts relating to the Avenue P shooting and clarified the § 924(c) charges. The superseding indictment included ten counts. Count One, the "war conspiracy" count, charged Malpeso and Gallagher with conspiracy to murder members of the Persico faction of the Colombo Family for the purpose of gaining entrance to and maintaining and increasing their positions in the Colombo Family, an enterprise engaged in racketeering activity, in violation of 18 U.S.C. § 1959(a)(5).

Count Two charged Malpeso with knowingly and intentionally murdering Speranza for the purpose of gaining entrance to and maintaining and increasing their positions in the Colombo Family, in violation of 18 U.S.C. § 1959(a)(1). Count Three charged Amato with knowingly and intentionally assisting offenders in order to hinder and prevent their apprehension, trial and punishment, knowing that an offense against the United States— the murder of Speranza in violation of 18 U.S.C. § 1959(a)(1)—had been committed, in violation of 18 U.S.C. § 3.

Counts Four through Six charged Malpeso and Gallagher with knowingly and intentionally (1) committing an assault with a dangerous weapon—the shooting of McLaughlin (Count Four); (2) committing an assault with a dangerous weapon—the shooting of Norden (Count Five); and (3) attempting to murder McLaughlin (Count Six), all for the purpose of gaining entrance to and maintaining and increasing their positions in the Colombo Family, in violation of 18 U.S.C. § 1959(a)(3) and (5).

Counts Seven through Nine charged defendants with using and carrying firearms in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1). Count Seven charged Malpeso and Gallagher with using and carrying guns in the crime of violence charged in Count One. Count Eight charged Malpeso with using and carrying guns in the crime of violence charged in Count Two. Count Nine charged Malpeso and Gallagher with using and carrying guns in the crimes of violence charged in Counts Four through Six.

Count Ten charged Malpeso with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

## IV. Convictions and Sentences

Following a jury trial, Malpeso, Gallagher and Amato were convicted on several counts of the superseding indictment. Malpeso was convicted on four § 1959 counts (Counts One and Four through Six), two § 924(c)(1) counts (Counts Seven and Nine), and the felon in possession count (Count Ten), and sentenced principally to a 95–year term of imprisonment. Gallagher was convicted on four § 1959 counts (Counts One and Four through Six) and two § 924(c)(1) counts (Counts Seven and Nine), and sentenced principally to a 39–year term of imprisonment. Amato was convicted in the Malpeso case on Count Three, charging him as an accessory after the fact in the murder of Speranza, which was committed in violation of § 1959(a)(1). He was also convicted on a § 924(c)(1) count charged in the Amato case, and sentenced principally to a 211–month term of imprisonment.[2] This appeal followed.

---

2. The Malpeso case originally was assigned to Judge Nickerson of the United States District Court for the Eastern District of New York, but was transferred to Judge Dearie. The Amato case was tried before Judge Nickerson. However, Amato's convictions in both the Amato case and the Malpeso case were consolidated for sentencing before Judge Dearie.

## DISCUSSION

### I. Admissibility of Scarpa/DeVecchio Evidence

Malpeso argues that the district court erred in precluding the defense from presenting evidence regarding confidential law enforcement information allegedly leaked by Federal Bureau of Investigation ("FBI") agent R. Lindley DeVecchio to Scarpa, a Persico faction member and an FBI informant. Malpeso contends that the excluded evidence would have shown that the alleged Colombo war was in fact a coup instigated by Scarpa and DeVecchio, and that Malpeso had no intent to violate 18 U.S.C. § 1959, because he was merely acting to protect himself and not acting to increase his position within the Colombo Family. Malpeso also argues that the court's error was not harmless, because other Orena faction members were acquitted when this evidence was introduced in their trials. We disagree.

 We review the district court's determination of the admissibility of evidence for abuse of discretion. *See United States v. Rioux*, 97 F.3d 648, 660 (2d Cir.1996). We will "not overturn a trial judge's evidentiary rulings unless the judge acted arbitrarily or irrationally." *United States v. Blanco*, 861 F.2d 773, 781 (2d Cir.1988). No abuse of discretion has been demonstrated.

Throughout the Colombo war, DeVecchio was the supervisor of C–10, the FBI squad investigating the Colombo and Bonanno crime families. He also was the sole contact agent for informant Scarpa. DeVecchio's fellow agents eventually became convinced that DeVecchio was providing law enforcement information to Scarpa. These fellow agents, in particular Agent Christopher Favo, waited a considerable time before expressing their concerns to DeVecchio's supervisor, Assistant Special Agent in Charge Donald North. During that time, it became apparent to Favo that Scarpa was aware of a significant amount of law enforcement information that Favo had given DeVecchio.

The government moved *in limine*, pursuant to Fed.R.Crim.P. 12(b) and 12(e), for an order precluding defendants from suggesting before the jury or otherwise eliciting testimony relating to the Scarpa/DeVecchio issue. In support of its motion, the government argued that defendants' true aim in seeking to introduce this evidence was to divert the jury's attention from defendants' conduct to the conduct of Scarpa, the FBI, and the U.S. Attorney's office during the Colombo war. The government further argued that the evidence was being sought to discredit the government and obtain an acquittal based upon jury nullification.

The district court determined that evidence of the Scarpa/DeVecchio issue was not relevant under Fed.R.Evid. 401 to the line of defense the defendants wished to pursue, and that any possible relevance was outweighed by the risk of unfair prejudice under Fed. R.Evid. 403. The district court was unpersuaded that the evidence would show that there was no war but rather "one nut running amok" and everyone else "taking cover." (Malpeso J.A. at 127). The court stated:

> I am struggling mightily to detect a line of relevancy that is sufficiently probative in my view to overcome what I think are legitimate 403 implications. Indeed, I'm having difficulty getting over the initial hurdle of relevance and what I have done aside from reading and rereading the papers is I've taken actually to reading the transcripts of the trials, including the arguments of counsel, particularly the defense in the Orena case and in the Cutolo case . . . .
>
> . . . .
>
> Putting aside, with all due respect, the rhetoric and hyperbole, [the Scarpa/DeVecchio issue] is a matter of very serious concern that needs to be explored in an appropriate forum. Whether this is such a forum really just depends on the question of whether or not it's relevant and, if so, sufficiently relevant to overcome what I consider to be a rather large potential, undeniable potential for prejudice.

(Malpeso J.A. at 167–68).

Fed.R.Evid. 402 provides that only "relevant evidence" is admissible. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the ac-

tion more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. However, Rule 403 provides that even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

▇ It seems to us that the district court properly exercised its discretion in determining that the Scarpa/DeVecchio evidence is of little or no relevance to the crimes charged in this case. Malpeso's argument that the evidence would show that Scarpa perceived himself as immune from prosecution and free to commit crimes with impunity does not lead to the conclusion that the Colombo war did not exist. If Scarpa had this power and information, he could have used it to pursue his own interests, or to advance the interests of the Persico faction. Malpeso's argument that his knowledge of Scarpa's emboldened position would make him concerned for his safety and motivated by self-defense is contradicted by the lack of evidence that it was commonly known among Orena loyalists, including Malpeso, that Scarpa had a law enforcement source. It is difficult to see how Scarpa's position could have informed their conduct if they were unaware of it.

▇ Furthermore, even if the evidence were of some marginal relevance, that relevance is far outweighed by the risk of prejudice. The likely (and presumably intended) effect of admitting evidence of the Scarpa/DeVecchio issue would have been to shift the focus away from the relevant evidence of the defendants' wrongdoing to the tangentially related misdeeds of one government agent. Such a diversion not only risked needlessly delaying the trial, but also created the very real possibility that the jury would improperly discredit the government's case in reaction to DeVecchio's allegedly gross misconduct. To the extent evidence of the Scarpa/DeVecchio issue may have been relevant, it was not improper for the district court to exclude the evidence under Rule 403.

▇ Finally, the fact that other district courts have reached different conclusions, admitting some or all of this evidence,[3] does not render the district court's decision in this case an abuse of discretion. *See, e.g., United States v. Williams,* 81 F.3d 1434, 1437 (7th Cir.1996) (that verdicts had been set aside in four related cases based on discovery of perjured testimony has no bearing on whether the district court from which appeal was taken abused its discretion in denying motion for new trial on same grounds). Indeed, the district court took the trouble to review the transcripts of the other cases and found therein additional support for its own evaluation of the minimal relevancy and prejudicial effects of the evidence offered in this case.

## II. Sufficiency of the Evidence Claims

Amato argues that there was insufficient evidence to convict him of being an accessory after the fact to a homicide committed in violation of 18 U.S.C. § 1959(a)(1), i.e., the Speranza murder, because there was insufficient evidence that the Speranza murder was committed for the purpose of "maintaining or increasing position in an enterprise engaged in racketeering activity," a requisite of 18 U.S.C. § 1959(a)(1). Specifically, Amato argues that because Speranza was an innocent bagel store clerk, not a target of the Orena faction, and his killing was essentially an accident or the result of an act of self-defense, his death at the hands of C. Liberatore could not possibly have served to promote or maintain C. Liberatore's position in the organization. We disagree.

"An appellant challenging the sufficiency of the evidence bears a very heavy burden." *Amato,* 15 F.3d at 235 (quotation omitted). "[T]he evidence [must] be viewed in the light most favorable to the government and all permissible inferences drawn in its favor." *United States v. Sureff,* 15 F.3d 225, 228 (2d Cir.1994). "[S]hould the evidence, thus construed, suffice to convince any rational trier

---

**3.** For instance, Judge Korman admitted the Scarpa/DeVecchio evidence in *United States v. Orena,* No. 93 CR 1366 (E.D.N.Y.). In *United States v. Cutolo,* 868 F.Supp. 39, 41 (E.D.N.Y. 1994), Judge Nickerson admitted evidence that Scarpa was an informant, but excluded evidence that an FBI agent may have leaked confidential information to him.

of fact beyond a reasonable doubt, then [the] conviction must stand. The government's case need not exclude every possible hypothesis of innocence, and the jury's verdict may be based entirely on circumstantial evidence." *Id.* (citations and internal quotation omitted).

■ The evidence presented was sufficient to permit a rational juror to infer that C. Liberatore committed the murder in violation of 18 U.S.C. § 1959(a)(1), and that Amato was an accessory after the fact to that offense. In *United States v. Concepcion,* we held that the motive requirement of § 1959 is "satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." 983 F.2d 369, 381 (2d Cir. 1992). We are not persuaded by Amato's argument that C. Liberatore entered the bagel store to kill Guerra and Ferrara in violation of 18 U.S.C. § 1959, but that when he saw that they were not there, murder in furtherance of his position ceased to be his object or intention, and that he simply was buying a soda when he shot Speranza in self-defense. We were unpersuaded by a similar argument in *Concepcion,* in which we rejected the defendant's contention that § 1959 does not apply to the murder of an "incidental victim" who "got in [the defendant's] way." *Id.* at 381–82.

The evidence presented clearly showed that the purpose and motivation for C. Liberatore's presence in the bagel store was to maintain or increase his position, and the position of the Orena faction, in the Colombo Family. Although Speranza was not an initially intended victim, his murder occurred in the course of a plot to murder in violation of 18 U.S.C. § 1959(a)(1). The facts presented make this clear: C. Liberatore searched the store for his targets and did not find them; he brought a soda up to the counter and asked where his targets were; Speranza asked why C. Liberatore wanted to know and, as he did so, reached below the counter; C. Liberatore drew his weapon and shot Speranza. What particular thoughts were going through C. Liberatore's mind are not

for us to know, but surely a reasonable jury could infer that C. Liberatore was still in the course of his murderous conduct when he asked Speranza where his targets were, and that C. Liberatore shot Speranza in part because he feared that Speranza might try to protect his bosses or otherwise impede C. Liberatore's objective.

Amato also argues that our opinion in *United States v. Thai,* 29 F.3d 785 (2d Cir. 1994), dictates a finding of insufficient evidence. This argument is without merit. In *Thai,* we held that there was insufficient evidence of a § 1959 violation where the defendant, the head of a criminal organization, bombed a restaurant for approximately $10,-000. *See id.* at 818–19. There was no evidence in that case that the bombing was anything more than a hired criminal act. In the present case, evidence was adduced that the Speranza murder was part of a purposeful attack on a rival faction's members in order to assert the dominance of the murderer's faction, and not merely a profit-motivated mercenary venture. Thus, the evidence sufficiently supported the conclusion that Speranza was murdered in violation of 18 U.S.C. § 1959(a)(1). Sufficient evidence was presented to convict Amato of being an accessory after the fact to a federal offense.

### III. *Jury Charge on the Gun Counts*

Gallagher argues that the court failed in several respects to properly charge the jury on the 18 U.S.C. § 924(c)(1) counts. First, Gallagher contends that the jury charge on the definition of "use and carry" did not comport with *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). Second, he argues that the court erred in not giving a limiting instruction with respect to certain weapons seized from co-conspirators' homes and car. Third, he contends that the court erred in instructing the jury on alternative theories of liability under the aiding and abetting statute and *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). We address these arguments seriatim.

### A. *Bailey*

Gallagher argues that the "use" instruction was fatally flawed because it did not require

sufficient evidence to show an "active employment" of the firearm, as required by *Bailey*, —— U.S. at ——, 116 S.Ct. at 506, and therefore conflated the meanings of "use" and "carry". We hold any error to be harmless.

The court charged the jury on the gun charges as follows:

If you find the defendant guilty of the corresponding violent crime, and when I say "corresponding" the violent crime referred to in the particular count, you must also find that the government has proved the following three elements beyond a reasonable doubt before you can find the defendant guilty of the firearm count you are considering:

First, that on or about the date charged, the defendant knowingly and intentionally used or carried a firearm;

. . . .

The first element the government must prove beyond a reasonable doubt is that the defendant knowingly and intentionally used or carried a firearm on or about the date charged in the indictment, as I have already explained those terms to you.

. . . .

In order for the government to sustain its burden of proof that the defendant used or carried a firearm, it is not necessary for it to establish that the weapon was fired.

(Tr. at 3276–77).

 Because no defendant objected to this instruction at trial, we review the charge for plain error. *See United States v. Birbal*, 62 F.3d 456, 459 (2d Cir.1995). For a conviction to be reversed for plain error, "(1) there must be an error; (2) it must be clear or obvious; and (3) it must affect substantial rights, which in most cases . . . means that the error must have been prejudicial." *Id.* at 461 (internal quotations and alteration omitted). "If an error meets these requirements, a court of appeals has authority to order correction, but is not required to do so. The applicable test is whether the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotations and citation omitted; alteration in *Birbal*).

 However, because *Bailey* had not yet been decided at the time of trial, we must apply a "modified plain error" standard. *See United States v. Viola*, 35 F.3d 37, 42 (2d Cir.1994); *see also United States v. Ballistrea*, 101 F.3d 827, 835 (2d Cir.1996) (applying *Viola*), *cert. denied*, —— U.S. ——, 117 S.Ct. 1327, 137 L.Ed.2d 488 (1997). In *Viola*, we held:

When the source of plain error is a supervening decision, the defendant has not been derelict in failing to object at trial, and there is thus no cause to shift the burden of proving prejudice to the defendant. In this special context, as in harmless error under Rule 52(a), the government must show that the error did not affect the defendant's substantial rights.

35 F.3d at 42. Therefore, we apply plain error review, but the burden is on the government to show that any error did not affect the defendant's substantial rights.

In *Bailey*, the Supreme Court held that "use" under § 924(c)(1) means "active employment". —— U.S. at ——, 116 S.Ct. at 506. The Court explained that "[t]he active-employment understanding of 'use' certainly includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm. . . . But the inert presence of a firearm, without more, is not enough to trigger § 924(c)(1)." *Id.* at 508. We have interpreted *Bailey* to require jury instructions on "using" that include "active-employment connotations." *United States v. Pimentel*, 83 F.3d 55, 60 (2d Cir. 1996).

 In this case, the court did not charge that "use" meant "active employment" of a gun. Nor did the court effectively differentiate between "use" and "carry", and the terms were arguably conflated. On the other hand, nothing in the charge suggested that "mere possession" or "proximity and accessibility" of a gun were sufficient to establish use, which was the Supreme Court's concern in *Bailey*. *See Bailey*, —— U.S. at ——, 116 S.Ct. at 506; *United States v. Melendez*, 90 F.3d 18, 20 (2d Cir.1996). Furthermore, because the district court gave little explanation of the meaning of "use", the jury pre-

sumably gave the term its "'ordinary or natural' meaning," *Bailey*, — U.S. at —, 116 S.Ct. at 506, which would require active utilization, not "mere possession."

We need not decide whether there was any error in the instruction, because if there were, it was certainly harmless. *See Pimentel*, 83 F.3d at 59 (applying harmless error). Gallagher was convicted on two counts of assault with a deadly weapon and one count of the attempted murder of McLaughlin, in furtherance of his position in the crime family. Given those verdicts on the Avenue P shooting and the proof of Gallagher's involvement as a shooter, the evidence of gun use, which is applicable to both Counts Seven and Nine, is incontrovertible. *See United States v. Masotto*, 73 F.3d 1233, 1242 n. 5 (2d Cir.) ("Although the district court did not instruct the jury that 'use' of a firearm requires a finding that the defendant 'actively employed' a firearm, the evidence establishes that crew members actively employed firearms during a violent crime."), *cert. denied*, — U.S. —, 117 S.Ct. 54, 136 L.Ed.2d 18 (1996).

### B. Co-conspirators' Guns

Gallagher also argues that the jury charge was erroneous because it did not include any limiting instruction that a conviction on Count Seven, which charged gun use in Count One, the war conspiracy, could not be based upon the firearms seized from an automobile driven by Daniel Pitera, the homes of Victor J. Orena and Christopher Barrett, and a garage belonging to Patty Amato. Gallagher contends that the introduction of these guns, in combination with the court's instructions on *Pinkerton* and aiding and abetting theories of liability, may have led to his § 924(c)(1) conviction based purely on his co-conspirators' mere possession of guns. We disagree.

■■■■ We review *de novo* the district court's jury instructions. *See id.* at 1238. "An erroneous jury instruction requires a new trial unless the error is harmless." *Id.*

■■■ Gallagher requested on several occasions a limiting instruction regarding guns seized from Pitera, Orena, Barrett and Patty Amato, the last time being at the charging conference. At that conference, Gallagher requested an instruction that "there is no evidence that Mr. Gallagher had anything to do with" weapons seized at Orena's home. The district court indicated that it was unwilling to make that sort of conclusion as to what the evidence proved. Gallagher appeared to agree that the charge was not necessary, stating: "I think we can take the argument off the traditional charge." (Tr. at 2747). Thus, it does not appear that Gallagher ever contested the *legal* relevance of the firearms to the *Pinkerton* or aiding and abetting theories, but rather contested the *factual* connection of those guns to Gallagher.

In any event, any possibility of prejudice is minimal. The record contains evidence of several instances in which the defendants used or carried firearms in connection with the Colombo war. For instance, the evidence showed that during the Avenue P shooting, Gallagher actively used a gun, and Malpeso gave C. Liberatore a gun with the instruction that he be a shooter. The evidence also showed that Gallagher and Malpeso were involved in the effort to kill Robert Tarantola in or about February of 1992, during which time at least two hit team members were carrying guns. Evidence also showed that Malpeso was carrying a gun during an attempt on Joseph Monteleone's life in 1992. Therefore, we hold that even if the lack of a limiting instruction was error, no prejudice resulted. *See Pimentel*, 83 F.3d at 60 (erroneous instruction does not warrant reversal where no danger that jury could have convicted based on legally insufficient theory).

### C. Other Theories of Liability

■■■ Gallagher also argues that the court erred in instructing the jury on two alternate theories of criminal liability for § 924(c) violations: aiding and abetting and *Pinkerton* liability. This argument is wholly frivolous. We have reaffirmed the appropriateness of aiding and abetting and *Pinkerton* theories of liability for § 924(c)(1) violations in several post-*Bailey* cases, *see id.* at 58 (*Pinkerton*); *United States v. Pipola*, 83 F.3d 556, 563 (2d

Cir.) (aiding and abetting), *cert. denied,* —— U.S. ——, 117 S.Ct. 183, 136 L.Ed.2d 122 (1996); *Masotto,* 73 F.3d at 1240 (both), and Gallagher presents no persuasive grounds upon which to distinguish his case from these earlier decisions.

### IV. Sentencing Claims

#### A. Constitutionality of U.S.S.G. § 1B1.2(d), comment. (n.5)

Malpeso argues that U.S.S.G. § 1B1.2(d), comment. (n.5) is unconstitutional because it authorizes the sentencing court to usurp the role of the jury by determining which objects in a multi-object offense were proved beyond a reasonable doubt.[4] We disagree.

Guideline 1B1.2(d) provides: "A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." Application note 5 explains:

> Particular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense.

Count One charged Malpeso and Gallagher with conspiracy to murder members of the Persico faction in order to gain entrance to and maintain and increase their positions in the Colombo Family, in violation of 18 U.S.C. § 1959(a)(5). Applying note 5 to the unenumerated murders in Count One, the district court concluded, beyond a reasonable doubt, that Malpeso had conspired to commit the McLaughlin/Norden shooting and to kill Speranza and the alleged bagel store owners, Ferrara and Guerra. We review *de novo* a challenge to the constitutionality of a sentencing guideline. *See, e.g., United*

States v. McKneely, 69 F.3d 1067, 1078 (10th Cir.1995).

The constitutionality of § 1B1.2(d), comment. (n.5) has not been addressed by this Court. The Tenth Circuit has expressly found the guideline unconstitutional, *see United States v. Bush,* 70 F.3d 557, 561–62 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 795, 133 L.Ed.2d 743 (1996), and the Ninth Circuit, in dicta concerning a pre-Guidelines sentence, has cast doubt upon its constitutionality, *see United States v. Garcia,* 37 F.3d 1359, 1371 n. 4 (9th Cir.1994). On the other hand, the Third and Seventh Circuits have held the guideline constitutional. *See United States v. Edwards,* 105 F.3d 1179, 1180 (7th Cir.1997), *petition for cert. filed,* (U.S. Apr. 21, 1997) (No. 96–8732); *United States v. Conley,* 92 F.3d 157, 168 (3d Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1244, 137 L.Ed.2d 327 (1997).

In *Bush,* the defendant pleaded guilty to one count of conspiracy to possess with intent to distribute and to distribute either cocaine base or cocaine powder. 70 F.3d at 559. The district court, applying § 1B1.2(d), comment. (n.5), sentenced the defendant on the basis of crack cocaine, which carries a higher offense level than cocaine powder. *See id.* at 560. The Tenth Circuit held that where a general verdict or plea is entered on a charge including several objects, the district court must sentence the defendant based on the object with the lowest offense level. *See id.* at 561. Based on this analysis, the *Bush* court held unconstitutional § 1B1.2(d), reasoning that

> [b]ecause the object of a conspiracy is an element of the offense, the Fifth and Sixth Amendments require a jury to determine all facts necessary to establish the existence of the object of the conspiracy, and the government must prove it beyond a reasonable doubt. Thus, the procedure authorized in U.S.S.G. § 1B1.2(d), comment. (n. 5) would have violated the Fifth and Sixth Amendments by taking this issue away from the jury and placing it in the hands of the judge.

---

**4.** This argument applies equally to Gallagher, who joins in his co-appellant's arguments pursu-

ant to Fed.R.App.P. 28(i), and to whom U.S.S.G. § 1B1.2(d) was also applied.

*Id.* at 561–62 (citations omitted).[5] *But see Edwards,* 105 F.3d at 1180 (rejecting cases with similar reasoning).

*Bush* is distinguishable from the case at hand, and we need not address its holding, nor the contrary holding of the Seventh Circuit in *Edwards.* Here, Malpeso was convicted in Count One of the commission of one crime under one statute—conspiracy to murder, in violation of 18 U.S.C. § 1959(a)(5). There is no question which crime he committed nor which statutory maximum sentence is applicable. *See* 18 U.S.C. § 1959(a)(5) (ten years). Nor is there any question that the objects of the crime are murders.

■■ It is clear to this Court, from the Supreme Court's decision in *Griffin v. United States,* 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), that the application of § 1B1.2(d), comment. (n.5) to this case involves valid sentencing considerations and not the violation of any Sixth Amendment guarantee. In *Griffin,* the Supreme Court rejected a due process argument that a general verdict of guilty to a multi-object conspiracy count could not stand if evidence on one of those objects was insufficient. *See id.* at 60, 112 S.Ct. at 474–75. We agree with the Third Circuit in *Conley,* which reasoned that if

> it were constitutionally impermissible to treat the object of a multi-object conspiracy indictment as a sentencing factor rather than as an element of the crime, then it is difficult to understand how the *Griffin* Court, consistently with [the requirement that the government prove every element of a crime beyond a reasonable doubt], could have permitted a conspiracy conviction to stand when there was insufficient evidence to support a conviction for one of the objects.

92 F.3d at 166.

The sentencing court's determinations on the objects of a multi-object conspiracy do not constitute criminal verdicts, such that a defendant's Sixth Amendment rights are violated. The jury returned a verdict on only one count of conspiracy to murder. In this case, as in *Griffin,* the proof or lack of proof of any one particular object of the conspiracy, even if arguably a constituent of the broad conspiracy, will have no effect on the verdict as a whole nor on the applicable statutory maximum sentence. Because the conspiracy conviction is satisfied if any one of the objects is proved beyond a reasonable doubt, the multiplicity of objects can only be, and certainly is, relevant to sentencing.

In light of our recognition that it is the function of the sentencing court to determine facts relevant to sentencing, and that this may be done by a preponderance of the evidence, *see Concepcion,* 983 F.2d at 388, the stricter "beyond a reasonable doubt" standard mandated by application note 5 cannot be in error. Thus, we hold constitutional U.S.S.G. § 1B1.2(d), comment. (n.5).

### B. Increase in Offense Level for Norden Injuries

Gallagher argues further that the sentencing court erred in increasing his offense level four points by transferring the injuries sustained by Norden, a victim in the Avenue P shooting, to the offense level for Counts Four and Six, conspiracy to murder/attempted murder/assault of McLaughlin. In particular, Gallagher contends that increasing his offense level for the injury to Norden was inappropriate because the conspiracy for which he was sentenced was the conspiracy to murder McLaughlin. We disagree.

The district court increased Gallagher's base offense by four levels based on the injuries sustained by Norden, pursuant to U.S.S.G. § 2A2.1(b)(1)(A), which instructs the court to increase by four levels "[i]f the victim sustained permanent or life-threatening bodily injury." The court explained:

> If you do the multiple count analysis and computations, as we have done, certain counts fold into themselves, and by that I mean the assault, the McLaughlin, Norden assault, the pseudo-count, the attempted

---

**5.** The Tenth Circuit noted that in a multi-object conspiracy case such as this, the only way to avoid the constitutional problem presented is either to make the language of the indictment specific, or "to instruct the jury to render a special verdict which reveals on its face which of the criminal objectives it found the government proved at trial." *Bush,* 70 F.3d at 562.

murder of McLaughlin, in my view, requires the Court to calculate the injuries to Daniel Norden as part of that count, in the classical, common law notion of transference. He could have been found guilty of the murder of Daniel Norden, God forbid the boy had died, even though he had no intention of murdering him. It seems to me perfectly logical, indeed compelling, that the injuries that that young fellow sustained should be calculated when we do the pseudo-count analysis into the pseudo-count involving the conspiracy to murder McLaughlin.

(App. at 637i–37j). However, the court also offered an alternative formulation of the increase as an upward departure:

But when we are calculating the attempt to murder Mr. McLaughlin, I don't use McLaughlin's injuries.... I think I am impelled, either as a matter of guidelines calculation, which I think is sound, or even as a matter of departure to calculate, if you will, the nature of the injuries sustained by Mr. Norden and that's where we differ.

(App. at 641).

 Although the district court offered alternative grounds for the four-level increase, we see no need to explore the application of the doctrine of transferred intent to this guideline, as the increase was clearly an appropriate upward departure. U.S.S.G. § 5K2.0, p.s., provides for departures from the Sentencing Guidelines where the sentencing court finds " 'an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' " (Quoting 18 U.S.C. § 3553(b).) Section 5K2.0 allows an upward departure for misconduct that, though not technically covered by the Guidelines' definition of relevant conduct, was still related to the offense of conviction. *See United States v. Tropiano*, 50 F.3d 157, 164 (2d Cir.1995). We review the district court's departure for an abuse of discretion. *See Koon v. United States*, —— U.S. ——, ——, 116 S.Ct. 2035, 2046, 135 L.Ed.2d 392 (1996). In so doing, we generally apply a three-part analysis: first, we

determine *de novo* whether this factor is related to the offense and not adequately considered by the Sentencing Commission, *see United States v. Sisti*, 91 F.3d 305, 315 (2d Cir.1996); second, we determine whether the district court's departure is supported by findings of fact, *see Tropiano*, 50 F.3d at 164; last, we ascertain whether the district court adequately has explained how it determined the extent of its departure, *see id.*

Courts have held that § 2A2.1 and similar guidelines that refer to increases based on injury to "the victim" are predicated upon the risk to a single intended victim, and do not account for injuries and risks of injury to bystanders or multiple victims. *See United States v. Carpenter*, 914 F.2d 1131, 1134 (9th Cir.1990) (§ 2A2.1); *see also United States v. Pittman*, 55 F.3d 1136, 1139 (6th Cir.1995) (§§ 2A1.5 and 2E1.4); *United States v. Moore*, 997 F.2d 30, 36–37 (5th Cir.1993) (§ 2A2.2(b)(3)); *United States v. Johnson*, 931 F.2d 238, 241 (3d Cir.1991) (same); *United States v. Graves*, 908 F.2d 528, 531 (9th Cir.1990) (same). For this reason, these courts have held appropriate upward departures based on aggravating circumstances where multiple victims or third-parties were injured in the offense, pursuant to U.S.S.G. § 5K2.0. *See, e.g., Moore*, 997 F.2d at 37; *Carpenter*, 914 F.2d at 1135.

On the other hand, in *United States v. Molina*, 106 F.3d 1118 (2nd Cir.1997), *petition for cert. filed*, (U.S. Apr. 25, 1997) (No. 96–8787), we explained that "any victim" in U.S.S.G. § 2B3.1(b)(3) includes bystanders assaulted in the course of a bank robbery. *Id.* at 1122. In *United States v. Muhammad*, 948 F.2d 1449 (6th Cir.1991), cited approvingly in *Molina*, the Sixth Circuit held that in a bank robbery, the actual victim of the crime is the bank itself, and "it would make no sense to provide for an increase ... for 'bodily injury' to the institution of the bank itself." *Id.* at 1456. Therefore, the Sixth Circuit reasoned that, while in crimes like assault, the victim might best be understood as the one direct victim of the offense, in the context of bank robbery, a broader definition was necessary, one that included those "affected by the commission of the crime." *Id.* at 1456 n. 1.

■ While this distinction in the meaning of "victim" in differing guidelines is somewhat troubling, the distinction is narrowly drawn and justifiable in light of the types of offenses they describe. Therefore, we think that "the victim" in § 2A2.1(b)(1) refers to the single intended victim of the attempted murder, and thus does not encompass Norden.

■ Given U.S.S.G. § 2A2.1's failure to provide for injuries to a bystander, we find that such injury is a proper ground for upward departure. U.S.S.G. § 2A2.1, comment. (n. 3) expressly provides for upward departures based upon "a substantial *risk* of death or serious bodily injury to more than one person." (Emphasis added.) It is clear to us that if departure based on a risk to a bystander is appropriate, then departure based upon actual injury to innocent third parties is equally appropriate under § 5K2.0. Therefore, the district court properly considered the life-threatening injury to Norden in departing upward from Gallagher's adjusted offense level.

■ Moreover, the district court made ample findings to support its departure. It is clear that the Norden injuries were closely related to the attempted murder offense, because Norden's injuries were both contemporaneous to and directly caused by the attempt on McLaughlin's life. Furthermore, the district court's calculation of the magnitude of departure was well-reasoned, as it was drawn in direct parallel to the provisions of § 2A2.1 accounting for injury to the victim of the attempt. *See, e.g., United States v. Kikumura,* 918 F.2d 1084, 1112 (3d Cir.1990) (analogy to existing guideline provision is appropriate in determining extent of departure). Therefore, we find no error in the district court's application of a four-level upward departure.

## C. Consecutive Terms for Using or Carrying Gun

Gallagher's final argument is that the district court erred by allowing him to be convicted on two § 924(c)(1) counts (Counts Seven and Nine) based on a single criminal impulse and action. In particular, Gallagher argues his second § 924(c) violation (Count Nine) was based on his participation in the Avenue P shooting (Counts Four through Six), and the first § 924(c) violation (Count Seven) was based on his participation in the conspiracy to murder members of the Persico faction (Count One), when in fact the jury may well have relied on the Avenue P shooting in finding him guilty of the war conspiracy. Therefore, Gallagher argues that he may have received two § 924(c)(1) convictions based on one criminal event, the Avenue P shooting, and that this is unlawful. We reject his argument because we disagree with his premise.

■ The evidence overwhelmingly established that Gallagher carried guns on several occasions throughout the conspiracy charged in Count One. There is no realistic possibility that the jury convicted on both 924(c) counts by focusing only on his carrying a gun during the Avenue P episode. Moreover, if Gallagher thought that the evidence of his carrying a gun on days other than the day of the Avenue P episode was too insubstantial to support a jury verdict on the gun count related to the overall conspiracy, he was obliged to seek appropriate relief before the case went to the jury. *See United States v. Washington,* 861 F.2d 350, 352–53 (2d Cir. 1988).

For these reasons we need not consider whether two offenses, committed at one time but sufficiently distinct in elements to permit separate sentences, may serve as the predicates for two consecutive 924(c) sentences based on a single act of carrying or using a gun. *Compare United States v. Floyd,* 81 F.3d 1517, 1527 (10th Cir.) (use of a gun in a kidnapping/carjacking supported violations of § 924(c)(1) for both substantive crimes because "[s]eparate crimes do not become a single offense merely because they arise out of the same criminal episode or because the same gun is paired with each underlying offense" (internal quotations omitted)), *cert. denied,* —— U.S. ——, 117 S.Ct. 144, 136 L.Ed.2d 91 (1996), *with United States v. Johnson,* 25 F.3d 1335, 1338 (6th Cir.1994) ("possession of one or more firearms in conjunction with predicate offenses involving simultaneous possession of different controlled

substances should constitute only one offense under § 924(c)"). Thus, we hold that the district court did not err in convicting Gallagher of two § 924(c)(1) offenses.

We have carefully considered the defendants' remaining contentions and find them all to be without merit.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.