UNITED STATES of America,
Appellee,

v.

Andrew CRISPO, Defendant–Appellant.

Docket Nos. 00–1711, 00–1712.

United States Court of Appeals,
Second Circuit.

Argued: Nov. 13, 2001.

Last Supplemental Brief Filed:
June 5, 2002.

Decided: Sept. 24, 2002.

Edward J.M. Little, New York, N.Y. (Lisa A. Cahill, Zuckerman Spaeder LLP, New York, NY, of counsel), for Defendant–Appellant.

James G. Cavoli, Assistant United States Attorney, New York, N.Y. (Mary Jo White, United States Attorney, Andrew J. Ceresney, Teresa A. Pesce, Jamie L. Kogan, Assistant United States Attorneys, Southern District of New York, New York, NY, of counsel), for Appellee.

Before: FEINBERG, CARDAMONE and POOLER, Circuit Judges.

CARDAMONE, Circuit Judge.

Defendant Andrew Crispo (defendant or appellant) appeals from a judgment of conviction entered October 13, 2000 in the United States District Court for the Southern District of New York (Hellerstein, J.) after a jury convicted him of one count of attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 (1994), and one count of attempted obstruction of justice in violation of 18 U.S.C. § 1503 (1994 & Supp. II 1996). Crispo also pled guilty to possession of crack cocaine in violation of 21 U.S.C. § 844 (1994 & Supp. II 1996), but takes no appeal from that conviction. Crispo was sentenced principally to concurrent prison terms of 85 months on each count of attempted extortion and attempted obstruction of justice, and to 12 months on the possession charge.

Defendant raises a number of objections to the proceedings below. We address three of them in this opinion. The remaining objections are without merit and are disposed of in a summary order filed concurrently with this opinion. We now consider whether: (1) a supplemental jury charge coerced the jury into reaching its verdict; (2) a trustee in bankruptcy is an "officer" within the contemplation of the obstruction of justice statute, 18 U.S.C. § 1503(a); and (3) the sentencing court erred in (a) ruling that a trustee in bankruptcy may be an "official victim" under U.S.S.G. § 3A1.2 (2000), (b) granting a two-point enhancement to Crispo's offense level on account of the victims' vulnerability, id. § 3A1.1, and (c) departing upward by two points for extreme psychological injury and other aggravating circumstances, id. §§ 5K2.0, 5K2.3.

One of the issues that we must resolve concerns defendant's conviction for attempted obstruction of justice. It is a universally accepted truth in the law that each of the elements of a crime must be proved at trial for there to be a valid conviction. The indictment in the appeal before us charges defendant with attempted obstruction of justice under 18 U.S.C. § 1503, in that he unlawfully, willfully and by threats endeavored to impede officers of a court of the United States in the discharge of their duties. Concededly, the proof at trial showed defendant's unlawful threats and willful conduct were designed to impede a trustee in bankruptcy in the discharge of his duties. To ensure that the punishment fits the crime of conviction, the alleged victim, here a private bankruptcy trustee, must also be shown under § 1503 to be an officer of a court of the United States. If not, defendant cannot be found guilty of obstruction of justice anymore than can a conviction for homicide stand if the victim was not a human being. Because the status of a private bankruptcy trustee is an open question, we asked the parties for additional briefing, the results of which are reflected in the discussion that follows.

## BACKGROUND

The events leading up to the commission of the alleged crimes began in 1996 when

Crispo, a noted art and antiques dealer, filed for bankruptcy in the Southern District of New York. The bankruptcy court appointed Robert Weiner, Esq., to serve as trustee and, in that capacity, to manage Crispo's estate. After his appointment, Weiner retained Sandra Mayerson, Esq., an attorney in his firm, as counsel in the bankruptcy proceedings. The crimes that eventually resulted in the instant prosecution developed out of this relationship and, in particular, Crispo's perception that Mayerson was mismanaging his assets.

Crispo and Mayerson's relationship began to sour over a disagreement as to whether a home Crispo owned in Charleston, South Carolina should be sold to satisfy his creditors' claims. That house, known as "Pineapple Gates," was a historic landmark and, at the time of its purchase, the most expensive home in Charleston. Seeing no alternative, attorneys Mayerson and Weiner arranged, over Crispo's objections, for the house to be auctioned. After the house had been sold, Crispo was furious and, blaming Mayerson, reportedly yelled, "I want everyone to know that this woman has stolen my house and I will see her in jail or I will see her worse." This was not an isolated threat. Mayerson and another attorney at her firm testified that Crispo continued to make threats against Mayerson.

In May 1997, about a month after defendant's first threat, Mayerson took her daughter Katy, who was two years old at the time, to Central Park to play. As they were preparing to leave, an unknown woman suddenly picked Katy up so that her male companion, who spoke a foreign language, could take a picture of the two of them. Mayerson at first believed the strangers were innocent tourists, but later became suspicious that Crispo may have arranged the encounter to obtain a photo of her daughter. Accordingly, Mayerson

informed the FBI of her suspicions and shared her concern with others, including acquaintances of Crispo's. This information was passed on to defendant and his attorney.

These events culminated on May 21, 1999 in the confrontation that is at the heart of this litigation. That day, Crispo faxed a reimbursement request for $2366 to a paralegal, Dawn Mulvey, at the trustee's law firm. In urgent need of money—he was being paid $5000 per month from the estate for living expenses—defendant called the law office several times, and even sent a messenger there to obtain his check. When someone informed Mulvey that Crispo's messenger had arrived, she called Crispo and told him the check was not yet ready. At this point, Crispo launched into an angry tirade. Then, he suddenly became silent and announced in a steady voice that "he had pictures of Sandy's daughter and he knew the park that Sandy's daughter played in and when [ ] all this is over he [was] going to kidnap Sandy's daughter." Mulvey understood this comment to be a threat in response to the fact that she "was taking too long to process a check" and that "[h]e wanted the check." The police arrested Crispo on May 24, 1999, and discovered just under five grams of crack cocaine on his person.

## DISCUSSION

### I *Allen* Charge

■ After a jury is charged there is an expectation that discussion among the jurors will move along toward a resolution of the issues submitted to them. But, on occasion, the discussions become "log-jammed" and no further progress can be anticipated. In these circumstances, the trial court will sometimes give the jury supplemental instructions commonly known as an *Allen* charge, which encourages jurors to listen to each other and reminds them that

they have a "duty to decide the case if they [can]· conscientiously do so." *Allen v. United States*, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The *Allen* charge, referred to as a "dynamite" charge, is intended to break-up the log-jam and permit the jury to move on toward a verdict. *See United States v. Kahaner*, 317 F.2d 459, 484 (2d Cir.1963).

In this case, the jury reported, after a day and a half of deliberations, that they had reached an impasse. When defendant learned of the jury impasse he moved for a mistrial. In denying that motion, the trial court decided that useful deliberations had likely not yet come to an end and, as a result, delivered the *Allen* charge to encourage the jurors to continue deliberating. An hour and 15 minutes later, the court received a second note informing it that one of the jurors could not agree. This lone holdout revealed her identity in court when she corrected a mistaken reading of her handwriting. Over the defendant's objection, the trial judge recessed court for the night and told the jury it would resume deliberations in the morning. Before the jury departed, the trial judge received another note requesting the *Allen* charge, but he did not respond to it that night.

The next morning the jury submitted a request for a government exhibit and a transcript of all of the trial testimony. The court provided the jury with the exhibit, ruled that it would be too cumbersome to provide the transcript, asked if the jury needed anything else, and reread the *Allen* charge requested by the jury the night before. A couple of hours later the jury returned a guilty verdict.

Defendant insists the district court erred by (1) failing to include sufficient cautionary language to remind holdout jurors to maintain their conscientiously held beliefs; (2) failing to grant the jury's request for the entire trial transcript; and (3) failing to grant a mistrial after the jury sent two notes indicating a deadlock, and instead rereading the *Allen* charge.

■ The first issue was not raised in the district court or in defendant's main brief in this Court. Between the time of the first *Allen* charge and defendant's submission of his reply brief in this Court, Crispo made only one objection related to the argument now before us. At trial, defense counsel stated, "My concern is that you told those who have reasonable doubts to listen to the others, but you have not told those who don't have a reasonable doubt to listen." Judge Hellerstein thereupon gave the jury the additional instructions for which Crispo's attorney had asked. After the requested cautionary language had been provided, defense counsel did not object to the wording of the charge again until the reply brief's extensive discussion of *Smalls v. Batista*, 191 F.3d 272 (2d Cir.1999). Given that the trial court provided the cautionary language requested, we see no reason to depart from our usual rule not to entertain an argument made for the first time in a reply brief. *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir.1993) (collecting cases). Thus, defendant waived any objections to the specific language of the charge.

Defendant next asserts that the combination of the following circumstances encouraged the holdout juror to abandon, without any principled reason, doubts that she conscientiously held as to the defendant's guilt. Appellant first complains that the *Allen* charge was read twice. He next asserts that the power of the *Allen* charge was compounded by the fact that there was only one holdout juror, whose identity was known. In addition to these two circumstances, Crispo thinks the district court undermined the lone dissenter's ability to maintain her position or convince

others of its wisdom by denying the jury's request for the entire transcript.

■ None of these arguments, considered separately or in combination, warrants a new trial. To begin, a trial court's decision to give an *Allen* charge is reviewed under an abuse-of-discretion standard. *United States v. Robinson*, 560 F.2d 507, 517–18 (2d Cir.1977) (en banc). Reversal is appropriate when the charge tends to coerce undecided jurors into reaching a verdict. Whether there has been coercion requires "an individualized determination." *Id.* at 517. In this case, the facts before us are substantially similar to, but less compelling than, those held to be insufficiently coercive by relevant precedents. In *Robinson*, the district court knew the jury was divided 11 to one, and still delivered an *Allen* charge twice, even though the jury had not, as here, requested such instruction. *Id.* at 511–12. In affirming the conviction, we noted "[t]he fact that the judge knew that there was a lone dissenter does not make the charge coercive inasmuch as the nature of the deadlock was disclosed to the Court voluntarily and without solicitation." *Id.* at 517 (quoting *United States v. Meyers*, 410 F.2d 693, 697 (2d Cir.1969)).

■ Even if a second reading and knowledge of the split do not necessarily make an *Allen* charge coercive, we must review the totality of the circumstances carefully given the undoubted pressure on a single holdout inherent in this so-called "dynamite" charge. *See Kahaner*, 317 F.2d at 484. Proceeding in this fashion, we do not believe the circumstantial evidence suggests the *Allen* charge created a coercive environment. For example, the jury's second deadlock note asked the court for guidance on how to proceed and, while the jury waited for an answer, they continued to deliberate without any direction from the court that they should do

so. The fact that the jury did not wait for the trial judge to intervene strongly indicates discussions were not then at a useful end.

Moreover, on the last day of deliberations, the jury did not return a verdict immediately after the *Allen* charge was reread at 10:25 a.m. but returned its verdict some time after lunch, which suggests that the charge was not so coercive as to end all reasoned discussion. In sum, there is no evidence here of any coercive effect "as is sometimes asserted to exist when a verdict follows almost immediately after the giving of the Allen charge." *Id.; see United States v. Hooton*, 662 F.2d 628, 636–37 (9th Cir.1981) (finding no coercive effect where jury received charge in morning and returned verdict in afternoon).

Finally, the district court's decision to deny the jury's request for the entire transcript of more than two weeks of trial proceedings does not support the defendant's contention that the holdout's position was undermined. It is unclear whether it was the holdout who wanted the transcript, and, in addition, Judge Hellerstein indicated his willingness to provide the jury with anything else they might need. If the holdout juror needed some specific piece of evidence to convince others to change their minds, she simply needed to ask. For these reasons, we see no abuse of the trial court's discretion.

## II Obstruction of Justice

### A. *Statute*

The next issue we address is whether Crispo was convicted of behavior punishable under 18 U.S.C. § 1503. To frame the question before us, it is useful first to examine the statute under which he has been charged. Title 18 U.S.C. § 1503 provides, in relevant part, that

whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or *officer in or of any court of the United States* ... in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer ... in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, *the due administration of justice,* shall be [guilty of a crime].

18 U.S.C. § 1503(a) (emphasis added). The Supreme Court has noted that there are at least four different ways to violate this statute, *United States v. Aguilar,* 515 U.S. 593, 598, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), two of which are relevant to the case at hand. As set forth in the first clause, the statute forbids attempts to influence court officers in the discharge of their duties and is relatively specific in its application. In contrast, the fourth clause, which forbids a person from endeavoring to influence, obstruct, or impede the "due administration of justice," is commonly referred to as the "omnibus clause" and is "far more general in scope than the earlier clauses of the statute." *Id.*

Although Crispo's indictment included both the court-officer and due-administration-of-justice theories of liability, the government did not pursue the due-administration-of-justice theory at trial. Instead, the prosecution only sought to establish Crispo's guilt under the court-officer clause and, as a result, the jury instructions were limited accordingly. Importantly, though there was virtually no direct

authority to suggest that a trustee was a court officer within the meaning of the statute, *but see Ex parte O'Neal,* 125 F. 967, 969 (C.C.N.D.Fla.1903), Crispo never challenged the legal adequacy of the government's remaining theory of criminal liability for obstruction of justice.

Despite Crispo's apparent waiver of the issue, we remained concerned that the conduct charged and proved at trial with respect to § 1503 did not constitute a crime—or at least not the crime of which he was convicted. *See* Fed.R.Crim.P. 12(b)(2) (instructing that when indictment fails to charge an offense, the error *"shall be* noticed by the court at any time during the pendency of the proceedings" (emphasis added)); *cf. Keeler v. Superior Court,* 2 Cal.3d 619, 87 Cal.Rptr. 481, 470 P.2d 617, 624 (1970) (court barred from pursuing indictment charging defendant with murder when victim did not fit statutory definition of "human being"). For this reason, we asked the parties to submit briefing answering (1) whether a bankruptcy trustee was an "officer in or of any court of the United States" within the contemplation of § 1503, and (2) what consequence, if any, arose from Crispo's failure to raise this issue himself. After receiving outstanding briefs from both the government and Crispo's new counsel, we have concluded that a trustee *is* a court officer protected by the court-officer prong of § 1503. Having so concluded, we need not discuss further any waiver-related issue.

### B. *Statutory History*

Crispo contends that the term "officer" in the text of § 1503—when considered in the historical context in which that statute was enacted—does not include a bankruptcy trustee. Defendant begins his argument by noting that § 1503 grew out of the second section of the Act of March 2,

1831, 4 Stat. 487 (Act of 1831), which was part of a congressional attempt to reform the contempt power of the courts. *See United States v. Essex,* 407 F.2d 214, 216 (6th Cir.1969). Before the Act of 1831 was passed, the punishment of contempts was governed by the Judiciary Act of 1789, 1 Stat. 83, § 17, which gave courts broad discretion to hold persons in contempt without the benefit of either indictment or a jury trial. *Warring v. Colpoys,* 122 F.2d 642, 643 & n. 4 (D.C.Cir.1941). Because abuses arose under this regime, the types of contempt that could be punished by the use of summary proceedings was drastically limited by Congress when it divided contempts into two categories.

In the first section of the Act of 1831, the statutory predecessor to 18 U.S.C. § 401 (1994), Congress affirmed the power of courts to use summary contempt proceedings to punish misbehavior that occurred in *the presence of or near to* the court itself. 18 U.S.C. § 401 ("A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; [and] (2) Misbehavior of *any of its officers* in their official transactions." (emphasis added)); *see also Essex,* 407 F.2d at 216. The second section, now § 1503, provided that all other contempts, or those that occurred *outside of the presence* of the court, could only be punished by indictment and trial. *See Nye v. United States,* 313 U.S. 33, 44–49, 61 S.Ct. 810, 85 L.Ed. 1172 (1941). In terms of the conduct covered, the principal difference between the first and second sections was geographical; one covered misbehavior that occurred near to or in the presence of the court, and the other controlled misbehavior that occurred away from the court.

## C. How Should § 1503 and § 401 Be Read?

■ Given the close relationship between the original two sections, Crispo argues that, absent evidence that we do otherwise, the modern versions of the Act of 1831 should be read consistently with each other. *See Northcross v. Bd. of Educ.,* 412 U.S. 427, 428, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973) (per curiam) ("The similarity of language in [two related statutes] is, of course, a strong indication that the two statutes should be interpreted *pari passu.*"); *United States v. Slevin,* 106 F.3d 1086, 1088 (2d Cir.1996) (fraud statutes that use the same relevant language, should be analyzed in the same way); *see also Nye,* 313 U.S. at 47, 61 S.Ct. 810 (noting that the original two sections "must" be read together); *Essex,* 407 F.2d at 218 (looking to § 401 cases to define the scope of actions that could be punished as "obstruction" under § 1503); *Warring,* 122 F.2d at 644 (relying on "the emphasis in the *Nye* opinion placed on Section 2 of the Act of 1831 in construing Section 1").

The government urges, on the contrary, the two provisions need not be read together. It contends the Supreme Court has construed § 401 with particular strictness because the Act of 1831 was intended to restrict the types of contempts that were punishable using summary procedures. *Cammer v. United States,* 350 U.S. 399, 403–04, 76 S.Ct. 456, 100 L.Ed. 474 (1956). Because § 1503 affords criminal defendants the traditional safeguards present in criminal prosecutions, the government continues, the justification for a narrow construction of § 1503 simply does not apply.

We are not persuaded by the government's distinction between § 401 and § 1503 for two reasons. First, as just observed, the two sections of the Act of

1831 curtailed courts' contempt powers by imposing geographic limits on the type of misbehavior that could be punished by summary proceedings. Nothing in the legislative history suggests that Congress also sought to curtail that power by the type of court officer involved, such that a contempt involving one type of court officer, for example a judge, could be punished by summary proceedings, while a contempt involving another type, for example a bailiff, could not. Second, because § 1503 is a criminal statute, we must construe it strictly for that reason alone. The distinction between strict construction and particularly strict construction is too slender a reed to rely on for the proposition that the word "officer" in the first section of the Act of 1831 was meant to be read more narrowly than the word "officer" in the second section. Nevertheless, our refusal to embrace this distinction is not critical to the government's position.

Defendant maintains that the Supreme Court has interpreted the word "officer" in the context of § 401(2) in such a way that it cannot be applied to a court-appointed trustee. In *Cammer*, 350 U.S. 399, 76 S.Ct. 456, 100 L.Ed. 474, which Crispo cites for support, the Supreme Court heard the appeal of an attorney convicted of contempt under the court-officer prong of § 401. *Id.* at 399–400, 76 S.Ct. 456. After tracing the history of the statute to the Act of 1831, the Court distinguished between the "conventional" meaning of the term "officer of the court" and its meaning when used in reference to an attorney. *Id.* at 405, 76 S.Ct. 456. In so doing, it emphasized that lawyers are engaged in a *private* profession that made them unlike marshals, bailiffs, court clerks, and judges, who are conventionally categorized as court officers. *Id.*

Based on that distinction, the Court went on to conclude that it saw "no reason

why the category of 'officers' subject to summary jurisdiction of a court under § 401(2) should be expanded beyond the group of persons who serve as conventional court officers and are regularly treated as such in the laws." *Id.* The High Court cited 28 U.S.C. §§ 601 963 to illustrate which types of officers would qualify under this definition. These sections constitute Part III of Title 28—entitled "Court Officers and Employees." Focusing on this citation, Crispo urges us to interpret the term "court officer" in § 1503 to include only those found within §§ 601–963 of Title 28.

In response, the government points out that 28 U.S.C. § 959, which is within Part III of Title 28, explicitly references trustees. Specifically, § 959 provides, *inter alia,* that "[t]rustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property." Importantly, § 959 falls within Chapter 57—entitled "General Provisions Applicable to Court Officers and Employees." Thus, the title of the Chapter implies that trustees are conventional court officers.

Although we think the government's statutory argument is compelling, several elements remain troubling. First, *Cammer's* emphasis on the fact that attorneys are engaged in a *private* profession and are not government employees as are marshals, bailiffs, clerks, and judges is not accounted for. Whether or not trustees are conventional court officers, there is no doubt they are private parties, not *government* employees. *See* 28 U.S.C. § 586(a)(1) ("private trustees"); 28 C.F.R. § 58.3 (same); *see also Cal. State Bd. of Equalization v. Sierra Summit, Inc.,* 490 U.S. 844, 848–49, 109 S.Ct. 2228, 104 L.Ed.2d 910 (1989) (holding that the states

may tax bankruptcy trustees because they "can tax any *private parties* with whom [the United States] does business … [unless the] instrumentality [is] so closely connected to the Government that the two cannot realistically be viewed as separate entities" (emphasis added)). Second, because debtors-in-possession are also mentioned in § 959, the government's logic would necessarily imply that they too are conventional court officers—a conclusion we are not sure we would endorse.

### D. *May Private Party Trustee Be a Court Officer?*

In light of the above, we are faced with two questions: whether a private person can be a conventional court officer, and, if so, whether there is a limiting principle such that our ruling does not necessarily apply to all other private persons who, simply because they have certain public duties to the court, are also referred to as "officers of the court." *Cf. Herron v. Cont'l Airlines, Inc.,* 73 F.3d 57, 59 (5th Cir.1996) (process server, though officer of the court, is not a "conventional court officer" for purposes of removal statute, 28 U.S.C. § 1442). The Bankruptcy Act of 1898, 30 Stat. 544 (Bankruptcy Act), which created the position of bankruptcy trustee, gives us the answer to both questions. The answer in each case is "yes." In § 1 of the Bankruptcy Act, entitled "Meaning of Words and Phrases," Congress stated that the term " 'officer' shall include clerk, marshal, receiver, referee, *and trustee.*" (Emphasis added). Thus, in the specific context of bankruptcy proceedings, Congress placed trustees in the category of court officers that *Cammer* would later list as paradigmatic conventional officers. Accordingly, a trustee in bankruptcy is also a conventional court officer protected by the court-officer prong of § 1503. Moreover, the rule of lenity does not dictate a contrary result. *See United States v. Wells,* 519 U.S. 482, 499, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended.").

■ Crispo's remaining arguments are easier to resolve. He declares, for example, that Congress could not have intended trustees to be covered by the court-officer prong of § 1503 because bankruptcy trustees did not exist in the United States when the Act of 1831 was passed. However, as Crispo himself observes, we construe statutes to avoid unreasonable results whenever possible. *See Merritt v. Shuttle, Inc.,* 245 F.3d 182, 191 (2d Cir.2001). It would be unreasonable for us to assume that Congress intended to protect only court officers defined as such on the date it passed the Act of 1831, rather than those officers and any others it specifically chose to label as court officers after 1831. As the government points out, Crispo's argument would imply that any person hired or appointed under the auspices of a bankruptcy court would not be entitled to § 1503 protection, including bankruptcy judges, simply because the bankruptcy court had not yet been created when the Act of 1831 was enacted. We reject this absurd result, ruling as a matter of common sense that a court officer is anyone Congress has defined as such, even when it did so after 1831.

The last argument defendant raises is that if trustees are court officers, it will potentially criminalize a wide range of innocent conduct because § 1503 would prohibit endeavors to influence, or intimidate a bankruptcy trustee. For example, he asserts that if a creditor threatened to report a trustee to the U.S. Trustee for not acting in accordance with the creditor's wishes, then the creditor would be in viola-

tion of § 1503. The critical flaw in Crispo's argument is that § 1503 only reaches *corrupt* endeavors to obstruct justice. *See United States v. Fasolino,* 586 F.2d 939, 940 (2d Cir.1978) (per curiam) ("The three elements of the crime are (1) endeavoring, (2) corruptly, (3) to influence an officer of the court or the due administration of justice.").

In sum, we hold that a trustee is an "officer in or of [the] court" and, for this reason, affirm Crispo's conviction for obstruction of justice.

## III Sentencing

We now turn to defendant's sentence, which included 85 months in prison, plus a term of supervised release, a fine and restitution. Crispo challenges his sentence on the grounds that (a) the district court erred in applying the official victim and vulnerable victim enhancements; (b) improperly departed from the guidelines based on a finding of extreme psychological injury to the victim; and, (c) impermissibly double-counted by simultaneously applying the vulnerable victim enhancement and the upward departure for psychological injury. We address each of these contentions.

### A. *Official Victim Enhancement*

The "official victim" adjustment, which raised defendant's offense level by three points, is properly applied if "the victim was a government officer or employee; a former government officer or employee; or a member of the immediate family of any of the above, and the offense of conviction was motivated by such status." U.S.S.G. § 3A1.2(a). To apply this enhancement, two basic elements must be found: (1) one of the victims of the extortion or one of their family members must have been a "government officer or employee," and (2) the crime must have been motivated by that status.

The district court reasoned that the first element was satisfied because a bankruptcy trustee is a "government officer" within the contemplation of the guidelines since he is an officer of the court. Although this element is somewhat complex, as our earlier discussion regarding the status of trustees as officers of the court demonstrates, the issue may be resolved relatively simply. While § 1503 refers to officers of the court, a phrase we ruled encompassed private parties and particularly trustees, the guidelines only refer to *government* officers and employees.

■ Unlike the term "court officer," the term "government officer" cannot be stretched to include private parties, at least with respect to bankruptcy trustees. The words "government" and "private" are opposite by definition. Black's Law Dictionary 1213 (7th ed.1999) (defining "private" as "[r]elating or belonging to an individual, as opposed to ... the government"). Further, the distinction between the two has important substantive effects for trustees outside of the context of the guidelines. *See, e.g., Cal. State Bd. of Equalization,* 490 U.S. 844, 109 S.Ct. 2228, 104 L.Ed.2d 910 (intergovernmental tax immunity); *Richardson v. Mount Adams Furniture (In re Greene ),* 980 F.2d 590 (9th Cir.1992) (sovereign immunity). For these reasons, we rule that a private bankruptcy trustee is not a government officer and consequently conclude that the official victim adjustment was erroneously applied to enhance Crispo's sentence. Without this enhancement, the sentencing range for Crispo's crime is 57 to 71 months. Crispo's sentence of 85 months exceeds this range. Therefore, the sentencing aspect of this case must be remanded to the district court.

## B. *Vulnerable Victim*

■ The district court also adjusted Crispo's offense level upward under the following guideline: "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." U.S.S.G. § 3A1.1(b). Although this adjustment applies if any one of the victims was vulnerable, the court found that Crispo's crimes affected "two vulnerable victims, Katy Mayerson, an infant, and Sandra Mayerson, a single mother." Further, it found Crispo acted with both knowledge of their vulnerability and the intention of intimidating them. Although defendant raises several objections to this adjustment, the only one that merits discussion is whether the judge made adequate findings to support his determination that Katy and her mother were vulnerable.

■ We review a district court's findings of fact for clear error and defer to its application of the sentencing guidelines to those facts. *United States v. McCall*, 174 F.3d 47, 49 (2d Cir.1998). The amount of deference owed depends "upon the relationship of the facts to the guidelines standard being applied," *United States v. Stroud*, 893 F.2d 504, 506–07 (2d Cir.1990) (quoting 134 Cong. Rec. H11257 (daily ed. Oct. 21, 1988)). Thus, if the inquiry "closely resembles a finding of fact, we apply the clearly erroneous standard;" if it resembles a purely legal question, then deference decreases accordingly. *McCall*, 174 F.3d at 49.

■ In general, for § 3A1.1(b) to apply, the victim of the crime must have been "particularly vulnerable" because of his "substantial inability to avoid the crime." *Id.* at 51. Accordingly, the vulnerability inquiry focuses on the victim's ability to protect himself from crime, not the likelihood of harm to the victim if the crime is completed. *Id.* at 49–50. In addition, when evaluating whether a victim is particularly vulnerable, it is not sufficient to decide that the individual is more vulnerable than others. Rather, the inquiry should concentrate on whether additional deterrents are necessary to protect such a victim. *Id.* at 51. Because the inquiry explores individual attributes, broad generalizations about victims based on their membership in a class are discouraged. Yet, class attributes can be sufficient if they make the finding of vulnerability beyond dispute. *Compare United States v. Drapeau*, 110 F.3d 618, 620 (8th Cir.1997) (finding one-year-old abuse victim vulnerable due to age), and *United States v. Boise*, 916 F.2d 497, 506 (9th Cir.1990) (finding six-week-old infant "unusually vulnerable"), *with United States v. Fosher*, 124 F.3d 52, 56 (1st Cir.1997) (rejecting district court's assumption that 62–year-old woman was unusually vulnerable due to age), and *United States v. Tissnolthtos*, 115 F.3d 759, 761–62 (10th Cir.1997) (unwilling to find 71–year-old victim particularly vulnerable due to age alone).

Ascribing vulnerability to Sandra Mayerson, a lawyer and partner in a law firm, simply because she is a single mother is problematic, especially in light of the policy disfavoring broad generalizations regarding members of a class. However, even absent detailed individualized findings, it may be presumed that an extra measure of deterrence is required to prevent the kidnaping of very young children. Unlike the aged, the relevant capacities of toddlers do not vary greatly. Katy Mayerson was only three or four years old at the time Crispo made his threats. No matter what kind of three-or four-year-old a child happens to be, he or she will not be able to fight off a potential kidnaper. Because the district court's finding that Katy was a vulnerable victim was not erroneous,

the enhancement to Crispo's sentence under § 3A1.1(b) was appropriate.

### C. *Upward Departure under §§ 5K2.0 and 5K2.3*

Appellant next objects that he was given insufficient notice of the district court's intent to upwardly depart from the adjusted offense level due to extreme psychological injury. In the alternative, he claims that the vulnerable victim adjustment plus the upward departure for extreme psychological injury constitutes double-counting. In reviewing these arguments, we first briefly set out how departures fit into the structure of the guidelines. Congress created the United States Sentencing Commission to establish a set of guidelines that would reduce unwarranted disparities in criminal sentences. *See Koon v. United States*, 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Under the guidelines, a sentencing court calculates the adjusted offense level based on "various factors related to the offense and the offender," *id.*, including, for example, whether the crime involved a vulnerable victim. U.S.S.G. § 3A1.1(b). For each adjusted offense level, the guidelines establish a range of prison terms within which the defendant must be sentenced. The sentencing court may go outside that range only when it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b) (1994); U.S.S.G. § 5K2.0.

To assist the sentencing court in the exercise of its discretion, the guidelines set out several factors that constitute either encouraged or discouraged bases for departure. For example, § 5K2.3 permits an upward departure when the victim suffers psychological injury that is sufficiently severe to effect a "substantial impairment of [ ] intellectual, psychological, emotional, or behavioral functioning."

In the instant case, the district court thought Crispo's behavior sufficiently egregious to constitute one of the exceptional circumstances warranting a departure from the guidelines range. In so ruling, it relied on both the generalized authority of § 5K2.0 and the specific provision for extreme psychological injury to victims under § 5K2.3. By citing both sections, the sentencing court presumably believed departure could be independently justified on either ground.

 Crispo argues that the sentencing court abused its discretion by failing to notify him that it was considering a § 5K2.3 departure and by finding that his behavior inflicted "extreme psychological injury" beyond that which was already contemplated by the guidelines. Defendant's first argument, that he was not given notice of the departure or the basis for it, can be rejected summarily. Although appellant is correct that either the government or the sentencing court must give defendant prior notice of the grounds that may be used to justify a departure from the guidelines, *see Burns v. United States*, 501 U.S. 129, 138, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991), he overlooks the fact that his presentence report specifically mentioned both the possibility of and the basis for an extreme psychological injury departure. No more notice than this is required. *See id.; United States v. Lopreato*, 83 F.3d 571, 577 (2d Cir.1996).

 Crispo's second point, that his crime did not present aggravating circumstances sufficient to warrant a departure, is not so easily resolved. In general, when a defendant challenges a trial court's authority to depart from the guidelines, we review the decision under an abuse-of-discretion standard. *Koon*, 518 U.S. at 100, 116 S.Ct. 2035. We substantially defer to

a district court's departure decisions because the large number of sentencing cases it encounters afford it an opportunity to·evaluate more expertly whether a case is so "unusual or exceptional" that departure is warranted. *Id.* at 98–99, 116 S.Ct. 2035. To facilitate review of departure issues, we have articulated a three-step test that considers first the legal question, which we review *de novo,* of whether the identified "factor [justifying the departure] is related to the offense and not adequately considered by the Sentencing Commission." *United States v. Malpeso,* 115 F.3d 155, 169 (2d Cir.1997). We turn to the particular facts of the case to determine, second, whether findings of fact support the departure, and, third, whether the sentencing court adequately explained how it determined the extent of its departure. *Id.* Importantly, in evaluating the court's findings of fact, we must be careful to avoid double-counting. That is to say, we must avoid counting a fact as supporting a departure when it has already been accounted for in setting the defendant's offense level. *See United States v. Mandel,* 991 F.2d 55, 58 (2d Cir.1993).

Crispo avers that the sentencing court did not and could not make factual findings sufficient to show that his crime involved aggravating circumstances, namely psychological injuries, beyond those contemplated by the guidelines. *See* U.S.S.G. § 5K2.3. To depart on this basis, there must have been a psychological injury that was "much more serious than that normally resulting from commission of the offense." *Id.* As noted, Crispo's adjusted offense level reflected an extortionate kidnaping threat involving a vulnerable victim. In determining the "normal" injury for this type of offense, the district court need not, according to the government, have considered that Crispo's offense level was adjusted to reflect the presence of vulnerable victims. This adjustment is irrelevant, the argument goes, because there is no double-counting when two different adjustments reflect different facets of a defendant's conduct. *See United States v. Marsh,* 955 F.2d 170, 171 (2d Cir.1992) (affirming separate adjustments for "abuse of a position of trust" and "more than minimal planning"). Accordingly, the government points out that, on the one hand, the vulnerable victim adjustment provides an extra degree of protection for victims that are "particularly susceptible" to crime, *United States v. Checora,* 175 F.3d 782, 794 (10th Cir.1999), and that, on the other hand, the departure for extreme psychological injury targets the effects of the crime, or the "quantity of harm" suffered by the victim. *United States v. Gill,* 99 F.3d 484, 486 (1st Cir.1996). In other words, the adjustment looks to a *cause* of the crime, the victim's susceptibility, and the departure looks to the *effect* of the crime, the victim's injury.

To determine if these victims' psychological injuries are "much more serious than that normally resulting from commission of the offense," we must identify the typical psychological injury associated with this specific offense. To identify the typical psychological injury, in turn, we must consider the ways in which the offense would trigger psychological injury. The gap in the government's logic is that it fails to acknowledge the various causes or triggers of psychological injury that have already been incorporated into the defendant's offense level. For example, when an extortion scheme involves a threat of kidnaping, it will likely cause more psychological injury than would typically result from extortion. Similarly, when a kidnaping threat involves a vulnerable victim, it too will likely result in more serious psychological injuries, both for those whose weaknesses are exploited and for those charged with their care. Consistent with

this analysis, in *Mandel,* 991 F.2d 55, the court vacated the sentence of a defendant, who pled guilty to bilking older women out of their savings through a lonely-hearts scheme, because the district court had failed to note, among other things, that at least some of the psychological injuries the victims suffered had been accounted for by the vulnerable victim adjustment. *See id.* at 58–59.

Thus, while the government is correct that the vulnerable victim adjustment and a psychological injury departure reflect different facets of a defendant's conduct, that does not mean that the vulnerable victim adjustment is irrelevant to the psychological injury analysis. In sum, for the departure in this case to be justified, the district court would need to find a psychological injury much more serious than one would expect from an extortionate kidnaping threat involving a vulnerable victim.

■ Significantly, the district court stated that in the typical case crimes of this nature require the victims to go through three to five years of counseling to recover. Because the court did not explain how Crispo's actions caused harm beyond this typical level, there is no assurance that the psychological injuries that resulted from defendant's crime were not already "fully accounted for by another part of the guidelines." *United States v. Napoli,* 179 F.3d 1, 12 n. 9 (2d Cir.1999) (quoting *United States v. Dudley,* 102 F.3d 1184, 1186 (11th Cir.1997) (per curiam)), *cert. denied,* 528 U.S. 1162, 120 S.Ct. 1176, 145 L.Ed.2d 1084 (2000). Requiring these kinds of findings ensures that departures for psychological injuries do not become the rule rather than the exception for serious crimes, such as murder or kidnaping.

■ Despite the oversight mentioned above, we will not order the sentencing court to reconsider the departure on remand. As stated, the sentencing court's decision to depart relied upon both the generalized authority of § 5K2.0 and the specific provision for extreme psychological injuries, § 5K2.3. With regard to the former, the sentencing court listed a number of factors that warranted a departure, including "the nature of what was expressed, the nature of the people involved and the numbers of people involved, the verbal force [with] which the threats were expressed, the period of time over which they occurred, [and] the position of Mr. Crispo." In his opening brief, defendant raised no objection to the sentencing court's reliance on these factors under the authority of § 5K2.0. Ordinarily, we cannot reach out and consider issues the defendant himself did not raise or brief. *See Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir.1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."). If any error was committed by the district court with regard to § 5K2.0, we do not believe it rises to the level of constituting manifest injustice that would warrant a departure from our usual rule. *See Chapman v. ChoiceCare Long Island Term Disability Plan,* 288 F.3d 506, 514 (2d Cir.2002). Moreover, the sentencing court has discretion to decide whether to allow briefing on this issue on remand. *Cf. United States v. Bryce,* 287 F.3d 249, 253 (2d Cir.2002) (noting that district court's sentencing decision may consider any factors that were not foreclosed by appellate decision).

## CONCLUSION

For the reasons stated, the convictions for obstruction of justice and extortion in violation of the Hobbs Act are affirmed. The sentence is vacated and the case is remanded to the district court to reconsid-

er the sentence imposed in a manner not inconsistent with this opinion.