**UNITED STATES of America,**
**Appellee,**

v.

**Shirley RANGOLAN, Defendant–**
**Appellant.**

**Docket No. 04–5126–CR.**

United States Court of Appeals,
Second Circuit.

Argued: Nov. 9, 2005.

Decided: Sept. 21, 2006.

**322**

Mark J. Lesko, David C. James, Assistant United States Attorneys, for Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Brooklyn, NY, for Appellee.

Edward S. Zas, The Legal Aid Society, Federal Defender Division, New York, NY, for Defendant–Appellant.

Before CALABRESI, B.D. PARKER, and WESLEY, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

Shirley Rangolan appeals from a judgment of the United States District Court for the Eastern District of New York (Wexler, *J.*) holding her in criminal contempt under 18 U.S.C. § 401(1), which authorizes courts to punish the "[m]isbehavior of any person in its presence or so near thereto as to obstruct the administration of justice." *Id.* On appeal, Rangolan contends that her misbehavior did not occur in, or sufficiently near, the court for § 401(1) to apply. Because we agree, we reverse and remand for entry of a judgment of acquittal.

## BACKGROUND

Rangolan was convicted of criminal contempt under § 401(1), charged as a misdemeanor, arising from her contact with a juror in the courthouse cafeteria during a federal civil trial in which she and her husband were plaintiffs. In April 1999, Rangolan and her husband successfully pursued an action against Nassau County and others, seeking damages for injuries Rangolan's husband suffered as a result of a beating by another inmate while incarcerated at the Nassau County Correctional Center. On January 6, 2003, a second trial commenced to apportion liability. At the start of the second trial, the district court instructed the jurors not to discuss the case among themselves or with any one else during the trial and not to permit anyone to discuss the case in their presence. The court also instructed the jurors

not to talk to the parties, the attorneys or the witnesses. In addition, outside the presence of the jurors, the court specifically instructed the parties and their attorneys "don't talk to the jurors, don't say hello, don't go near them." It is not disputed that Rangolan heard all of these instructions.

On the third day of the trial, January 9, after jury deliberations had commenced, one of the jurors informed the court that Rangolan had approached him earlier that morning in the courthouse cafeteria, located on the main floor, ten floors below the courtroom. The juror explained that Rangolan placed a stack of papers on his table and said, "I think you should read this." The top document was entitled "Violations of the Nassau County Jail in Hempstead." After looking at the title page, the juror returned the papers to Rangolan, stating "I don't think I should be reading this."

When the juror informed the court of the incident, it inquired into what had transpired. Once the court satisfied itself that the incident would not affect the juror's judgment, he was permitted to rejoin deliberations. This event caused a delay of approximately a half hour in the start of deliberations, and consequently, according to the government, obstructed the administration of justice.

The court ordered Rangolan to show cause as to why she should not be held in contempt, and in due course a criminal proceeding against her was randomly assigned to a different judge. Rangolan requested a jury trial pursuant to 18 U.S.C. § 3691, which authorizes jury trials on charges of criminal contempt that do not occur in the presence of the court. Rangolan contended that she was entitled to a jury because her conduct occurred in the cafeteria, rather than in court, and because it was not sufficiently disruptive to amount to obstruction of justice.[1]

The government opposed the request on the ground that, because the misconduct occurred sufficiently near the courtroom, § 401(1) applied. The government also contended that the contempt charge could be treated as a misdemeanor if the court committed to limiting any sentence to six months' imprisonment and a $5,000 fine.

The district court agreed that § 401(1) applied, committed to the limitation proposed by the government and denied Rangolan's request for a jury. Following a bench trial, Rangolan was convicted of violating § 401(1). The court found that Rangolan "knew she was not supposed to approach a juror. She approached the juror for the sole purpose of influencing the jury. She did it knowingly and intentionally and in violation of the Court's rules and common sense and fair play." The court also found that the incident occurred sufficiently near the courtroom "[b]ecause it was an ongoing trial before a judge, the incident occurred in the cafeteria which is on the first floor and the judge's chambers and the jury room is on the 10th floor, it was also interrelated." The court concluded that Rangolan and the juror "were all here for Court business" and that they "were all on their way to Court business and it was Court business." Rangolan was sentenced principally to three years probation and fined $1,000. This appeal followed.

## DISCUSSION

On appeal, Rangolan challenges the sufficiency of the evidence supporting her conviction, contending that the govern-

---

1. Illustrating how no good deed goes unpunished, had the district court acceded to Rangolan's request to proceed under § 3691, she would have been exposed to a felony conviction, instead of a misdemeanor conviction for violating § 401(1).

ment failed to prove two of the three elements of § 401(1): that her contact with the juror obstructed the administration of justice, and that the incident took place "in the court's presence or so near thereto as to obstruct the administration of justice." 18 U.S.C. § 401(1).[2] We hold that Rangolan's conduct occurred sufficiently far from the courtroom so that it did not satisfy the "in or so near" element. Consequently, we do not reach the question of whether an obstruction occurred.

We review challenges to the sufficiency of evidence *de novo. United States v. Jones,* 393 F.3d 107, 111 (2d Cir.2004). In addressing Rangolan's sufficiency claim, our concern is whether a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jackson,* 368 F.3d 59, 63 (2d Cir.2004) (internal quotation marks omitted).

The power of courts to punish contempts is "a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law." *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797 (1911). However, over its long history, the power has, on occasion, been abused. *See, e.g., Bloom v. Illinois,* 391 U.S. 194, 198–207, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968) (outlining the history of the contempt power, and its abuses); *United States v. Barnett,* 376 U.S. 681, 687, 701–24, 84 S.Ct. 984, 12 L.Ed.2d 23 (1964) (same); *Nye v. United States,* 313 U.S. 33, 44–48, 61 S.Ct. 810, 85 L.Ed. 1172 (1941) (same). In response, Congress and the courts have placed appropriate limits on this power. We now consider whether the district court exceeded these limits when it elected

to prosecute Rangolan's misbehavior as a direct contempt under § 401(1), instead of as an indirect contempt under § 401(3).

Direct contempts implicate the trial judge's ability to control behavior in and around the court room, and typically involve conduct that must be addressed quickly and often summarily. *See, e.g., United States v. Marshall,* 371 F.3d 42, 46 (2d Cir.2004) (obscene remark about a judge and his wife during sentencing hearing appropriately punished summarily as a direct contempt). As the Supreme Court explained, direct contempts are used "to maintain order in the courtroom and the integrity of the trial process in the face of an actual obstruction of justice," and summary adjudication of direct contempts is justified "[i]n light of the court's substantial interest in rapidly coercing compliance and restoring order." *Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 832, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (internal quotation marks omitted). Accordingly, Rule 42(b) of the Federal Rules of Criminal Procedure, which addresses direct contempts, provides for the summary adjudication of "a person who commits criminal contempt in its presence if the judge saw or heard the contemptuous conduct and so certifies." Fed. R.Crim.P. 42(b). *See Pounders v. Watson,* 521 U.S. 982, 988, 117 S.Ct. 2359, 138 L.Ed.2d 976 (1997) (noting that summary contempt under the current Rule 42(b) is appropriate "where all of the essential elements of the misconduct are under the eye of the court [and] are actually observed by the court").

In addition, the court may elect to prosecute direct contempts at the end of the proceeding or in a separate proceeding, as

---

**2.** No one disputes that Rangolan's conduct constituted contemptuous misbehavior, the third element of § 401(1). *See generally United States v. Giovanelli,* 897 F.2d 1227, 1230 (2d Cir.1990) (outlining the three elements of § 401(1)).

did the judge below. *See United States v. Giovanelli*, 897 F.2d 1227, 1230 (2d Cir. 1990); *see, e.g., Harris v. United States*, 382 U.S. 162, 166–67, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965); *In re Pilsbury*, 866 F.2d 22, 26–27 (2d Cir.1989); *United States v. Lumumba*, 741 F.2d 12, 15–17 (2d Cir.1984). Delayed adjudication typically occurs where, as here, the testimony of the defendant or of other witnesses may be involved. In such cases, the defendant is entitled to notice and a hearing before a different judge, *see Taylor v. Hayes*, 418 U.S. 488, 497–500, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), and the proceeding is controlled by Rule 42(a) of the Federal Rules of Criminal Procedure, which provides that "any person who commits criminal contempt may be punished for that contempt after prosecution on notice." Fed.R.Crim.P. 42(a).

"Indirect" contempts, by contrast, generally involve disobedience to court orders, and can occur anywhere.[3] While indirect contempt proceedings often involve challenges to judicial authority, they do not necessarily implicate courtroom decorum. Summary adjudication of indirect contempts is prohibited, and indirect contemnors are entitled to all the procedural protections of Rule 42(a).

A critical difference between direct and indirect contempts is geographic, and distinguishing between the two requires an examination of the physical proximity of the contempt to the court. Rangolan ac-

knowledges that her misbehavior may have formed the basis for prosecution as an indirect contempt for "disobedience or resistance to its lawful writ, process, order, rule, decree, or command" under § 401(3) or for jury tampering under § 1503(a) or § 1504. But she contends that she should not have been prosecuted under § 401(1) for a direct contempt because her misbehavior was not sufficiently "in the court's presence or so near thereto as to obstruct the administration of justice."

This key "in or so near" language currently found in § 401(1) was analyzed by the Supreme Court in *Ex Parte Savin*, 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150 (1889), and *Nye v. United States, supra. Ex Parte Savin* addressed what it means to be "in the presence of" the court for purposes of direct contempt. The Supreme Court explained that "when in session, [the court] is present in every part of the place *set apart* for its own use, and for the use of its officers, jurors, and witnesses . . . ." *Id.* at 277, 9 S.Ct. 699 (emphasis added). Thus, courtrooms, jury rooms, witness rooms, and hallways immediately adjacent to these rooms (especially if used for the assembly of jurors) are, for contempt purposes, in the presence of the court while it is in session.

*Nye*, while interpreting section 268 of the Judicial Code (the predecessor to § 401(1)), traced the roots of the "in or so near" language to the Act of March 2, 1831, ch. 99, 4 Stat. 487.[4] *Nye* emphasized

---

**3.** *See Int'l Union*, 512 U.S. at 827 n. 2, 114 S.Ct. 2552 (noting the procedural differences between direct and indirect contempts). *See also* Earl C. Dudley, Jr., *Getting Beyond the Civil/Criminal Distinction: A New Approach to the Regulation of Indirect Contempts*, 79 Va. L.Rev. 1025, 1030–31 (1993) (defining "indirect contempts" as "contumacious acts committed outside the presence of the court" and noting that "[v]irtually all indirect contempts

today involve disobedience of judicial orders").

**4.** Section 1 of the Act of 1831, from which § 401(1) derives, states in relevant part: "That the power of the several courts of the United States to issue attachments and inflict summary punishments for contempts of court, shall not be construed to extend to any cases except the misbehaviour of any person or persons in the presence of the said courts,

that the Act of 1831 was "a drastic delimitation by Congress of the broad undefined power of the inferior federal courts under the Act of 1789," and specifically observed "[t]hat the previously undefined power of the courts was substantially curtailed by" the Act of 1831. *Nye*, 313 U.S. at 45, 61 S.Ct. 810; *see, e.g., In re Michael*, 326 U.S. 224, 227, 66 S.Ct. 78, 90 L.Ed. 30 (1945) ("[T]he references to [the Act of 1831's] history in the *Nye* case reveal a Congressional intent to safeguard constitutional procedures by limiting courts ... to the least possible power adequate to the end proposed.") (internal citations and quotation marks omitted); *Ex parte Robinson*, 19 Wall. 505, 86 U.S. 505, 510–11, 22 L.Ed. 205 (1873) ("The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this [summary contempt] power. But the power has been limited and defined by the act of Congress of March 2d, 1831.").

*Nye* concluded that "misbehavior ... so near" the presence of the court was a spatial limitation that meant "misbehavior in the vicinity of the court." *Nye*, 313 U.S. at 52, 61 S.Ct. 810. As such, summary contempt was limited to those acts of misbehavior that did not simply obstruct justice but that occurred in the physical presence of the court or close enough as to be "disrupti[ve] to quiet and order or [to] actually interrup[t] the court in the conduct of its business." *Nye*, 313 U.S. at 52, 61 S.Ct. 810. This test is one of "physical proximity, not relevancy." *Id.* at 49, 61 S.Ct. 810.[5] *See United States v. Crispo*, 306 F.3d 71, 80 (2d Cir.2002) (stating that

*Nye's* interpretation of the Act of 1831 "curtailed courts' contempt powers by imposing geographic limits on the type of misbehavior that could be punished by summary proceedings").

Since *Nye*, courts have used "close physical proximity" as a proxy for determining whether misbehavior occurred "so near" the presence of the court. *See, e.g., Blalock v. United States*, 844 F.2d 1546, 1557 n. 14 (11th Cir.1988) (Section 401(1) "contains a geographic limitation, such that the contumacious act must occur in the immediate vicinity of the court, e.g., in the courtroom, the jury room, the grand jury room, or the hallways outside.") (citing *Nye*, 313 U.S. at 48–51, 61 S.Ct. 810); *In re Stewart*, 571 F.2d 958, 966 (5th Cir. 1978) ("The words 'so near thereto' are meant as geographic terms that limit the subsection's application to acts within the immediate vicinity of the courtroom such as the adjoining hallway or the jury room.") (citing *Nye*, 313 U.S. at 48–49, 61 S.Ct. 810). *See also, e.g., United States v. Arredondo*, 349 F.3d 310, 316 n.6 (6th Cir. 2003) (noting that *Nye* imposed geographic limitations on direct contempts); *Crispo*, 306 F.3d at 80 (same); *Waste Conversion, Inc. v. Rollins Envtl. Servs. (NJ), Inc.*, 893 F.2d 605, 608 (3d Cir.1990) (en banc) (same). For example, the D.C. Circuit found that misbehavior occurring in a corridor approximately thirty feet from the courtroom entrance satisfied the geographic standard of being "so near" to the court's presence. *See Higgins v. United States*, 160 F.2d 223, 224 (D.C.Cir.1947) (per curiam). In contrast, where the near-

---

or so near thereto as to obstruct the administration of justice ...."

**5.** Prior to *Nye*, this phrase was construed as connoting "causality" or "relevancy," based on the Supreme Court's earlier holding in *Toledo Newspaper Co. v. United States*, 247

U.S. 402, 418–19, 38 S.Ct. 560, 62 L.Ed. 1186 (1918); *but see id.* at 423, 38 S.Ct. 560 (Holmes, J., dissenting) (stating that the limiting phrase "so near thereto as to obstruct" was "too plain to be construed away"). However, *Nye* expressly overruled *Toledo*. *See Nye*, 313 U.S. at 47–48, 50, 61 S.Ct. 810.

est act of misbehavior was a number of miles from the courthouse, the Third Circuit reversed a criminal contempt conviction, finding that the conduct was geographically too remote. *See United States v. Welch,* 154 F.2d 705, 707 (3rd Cir.1946).

In sum, *Nye* and its progeny significantly limited the exercise of direct contempt power. *See, e.g., Bloom,* 391 U.S. at 207, 88 S.Ct. 1477 ("This course of events demonstrates the unwisdom of vesting the judiciary with completely untrammeled power to punish contempt, and makes clear the need for effective safeguards against that power's abuse."); *Harris,* 382 U.S. at 164–65, 86 S.Ct. 352 (direct contempts reserved for "exceptional circumstances" and are a "narrow category" of contempt); *In re Michael,* 326 U.S. at 227, 66 S.Ct. 78 ("The exercise by federal courts of any broader contempt power than this would permit too great inroads on the procedural safeguards of the Bill of Rights, since contempts are summary in their nature, and leave determination of guilt to a judge rather than a jury."); *Arredondo,* 349 F.3d at 317 (direct contempt liability under § 401(1) "should be 'circumscribed as narrowly as is consistent with the maintenance of order and decorum essential to the effective operation of the judicial system' ") (quoting *United States v. Oberhellmann,* 946 F.2d 50, 53 (7th Cir.1991)). This limitation, of course, implicates the general principle that criminal statutes are to be strictly construed. *See Crispo,* 306 F.3d at 80 ("[B]ecause [the statute] is a criminal statute, we must construe it strictly for that reason alone."); *see also United States v. Wilson,* 421 U.S. 309, 319, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975) ("We adhere to the principle that only '[t]he least possible power adequate to the end proposed' should be used in contempt cases.") (quoting *Anderson v. Dunn,* 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821)).

With these principles in mind, we turn to the government's proof that Rangolan violated § 401(1). Rangolan's misbehavior occurred not in court, but in a cafeteria ten floors below the court room. Unlike jury rooms, witness rooms, or immediately adjacent hallways, the cafeteria is not a place "set apart" for official court business, or for the use of jurors or other trial participants. The juror was not on official business but was simply having breakfast. Moreover, Rangolan's misbehavior took place at 9:15 a.m., before the court was in session. *See, e.g., Farese v. United States,* 209 F.2d 312, 317 (1st Cir. 1954) ("Under these circumstances it seems to us an undue stretching of this concept of 'presence' to say that the court was then and there present in the corridor, where no court business was currently being transacted."). Deeming the court "present" in a public cafeteria ten floors below the courtroom and not shown to have been separated out for court business, at a time when court is not in session, distorts the important geographical and temporal limitations Congress intended when it passed the predecessor to § 401(1) to, in part, limit the contempt power.

For many of the same reasons, we also conclude that Rangolan's misbehavior does not qualify as conduct "so near to" the court, as defined by Nye and its progeny. Suppose, for example, that instead of confronting the juror in the cafeteria, Rangolan had driven several miles to the juror's home and handed him the stack of papers, or that Rangolan confronted the juror in a coffee shop across the street from the courthouse. Under the government's theory, Rangolan would still have violated § 401(1) because the trial judge would have been forced to turn his attention away from the trial to address the miscon-

duct and a delay would have resulted. This result, of course, ignores *Nye*, which requires us to focus on the geographic proximity of the 22 misbehavior, not simply on whatever obstruction may have occurred. In other words, the degree of obstruction would have been largely identical if the misbehavior occurred in either the cafeteria or the juror's home or the coffee shop, yet it could not be seriously argued that the misconduct in the latter locations occurred geographically "so near" to the court as to obstruct justice. While it may have occurred in the same building, we nonetheless conclude that Rangolan's misbehavior in the cafeteria is geographically and conceptually more akin to misbehavior across town at the juror's home or in the coffee shop, than it is to misbehavior in a jury room, witness room, or hallway adjacent to the courtroom. We thus conclude that conduct taking place in a public cafeteria ten floors away from the courtroom at a time when the court is not in session was not conduct that occurred "in or so near the presence" of the court as required by § 401(1).

## CONCLUSION

Since the Government did not prove an essential element, the judgment is reversed and the case is remanded with instructions to enter a judgment of acquittal.